[This opinion has been published in *Ohio Official Reports* at 74 Ohio St.3d 381.]

THE STATE OF OHIO, APPELLEE, *v*. WILSON, APPELLANT.

[Cite as *State v. Wilson*, 1996-Ohio-103.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(No. 94-2537—Submitted November 14, 1995—Decided January 24, 1996.)

APPEAL from the Court of Appeals for Lorain County, No. 92CA005396.

―――――――――――

{¶ 1} In Elyria, on Saturday, May 4, 1991, around 1:30 p.m., defendant-appellant, Daniel Wilson, killed Carol Lutz by locking her in the trunk of her car, puncturing the gas tank, and setting the car on fire. Wilson then walked away, allowing Carol Lutz to be baked alive.

{¶ 2} On the previous afternoon, Wilson was drinking at the Empire Tavern, a bar he frequented. Between 5:00 and 6:00 p.m., he went to the home of Angie Shelton, a girl he dated. As they argued, Wilson got mad, "slammed" her "against the wall," threw her on the bed, and "went to hit" her. Shelton told him that if he hit her, she "would be the last person that he hit." Wilson then left, and later returned to the Empire Tavern.

{¶ 3} That evening, Carol Lutz drove her 1986 Oldsmobile Cutlass to the Empire Tavern to meet Douglas Pritt, an old boyfriend, and Wilson, apparently a new friend. Pritt, Lutz and Wilson played pool and drank together. Pritt left the bar sometime between 12:30 a.m. and 1:00 a.m. Lutz left close to 2:30 a.m., and Wilson left right after she did. According to Wilson's confession, Lutz offered him a ride home. She drove with him to the trailer where he lived. Once there, they drank one or two beers. Wilson vaguely recalled driving to Lorain to search for a party, and stopping at his father's house.

{¶ 4} Darlene DeBolt, a service station cashier in Stow, stated that Wilson stopped at the station around 5:55 a.m. on May 4. He was driving a black Oldsmobile

Cutlass and appeared to be alone. DeBolt did not hear any noise coming from the Oldsmobile. Wilson told DeBolt, an old friend, that the car was his, that he had just driven from Canada, and that he "stopped a few states back for a few beers." DeBolt smelled alcohol on him. Wilson tried to get DeBolt to go out with him and was "persistent and pushy." DeBolt refused to leave work and after sixty or ninety minutes, Wilson left.

{¶ 5} When Wilson woke up on May 4, around 7:30-8:00 a.m., he was in a parking lot, sitting in the driver's seat of Lutz's Oldsmobile. Lutz, who was locked in the trunk, asked him to let her out, but he did not. Wilson could not recall how she got there. He drove to various places including a park where he took a walk. He remembers thinking, "How am I going to get out of this?" Throughout this time, Lutz remained locked in the trunk.

{¶ 6} Later that morning, Wilson drove to a school and parked the Oldsmobile. After awhile he took off the gas cap, stuffed a rag in the open neck of the gas tank and lit the rag. This time, the fire burned out. Lutz told him "she really had to go to the bathroom." He "took the rag back out" of the gas tank and "let her [out to] go to the bathroom."

{¶ 7} When he "told her to get back" in the trunk, "she stood there--she begged and pleaded with me. She begged--she'd turn around for 30 seconds and let me run like hell." Lutz told Wilson, "she'd go home and forget about it." Wilson didn't believe her and thought to himself, "How can you forget about being locked in a trunk?" Wilson stated that he did not just leave her in the trunk because he "figured somebody would find her ***. She'd get out and tell who I was."

{¶ 8} When Wilson told her to get back in the trunk a second time, she complied. She sat in the trunk for fifteen to twenty minutes with the lid up. They talked, and "[s]he asked me why don't I just let her go?" He "even gave her a cigarette." Then he closed the trunk lid, "poked a hole in the gas tank," stuffed a towel or blanket

2

into the gas tank, "let it soak with gas *** and *** lit it." Then he "walked away from the car" and went to a nearby park.

{¶ 9} While out driving that day, Janette Patton and her mother noticed smoke and saw Lutz's Oldsmobile enveloped in fire. Within a short time, an ambulance arrived. A paramedic opened a door to check for people and saw that there were none in the passenger compartment.

{¶ 10} At 1:34 p.m., the Elyria Fire Department responded to reports of a car fire. Firemen extinguished the fire and forced open the trunk of the Oldsmobile. Steam and smoke poured from the opened trunk obscuring their view. When firemen extinguished the remaining flames, they found Lutz's body.

{¶ 11} Lutz died from third-degree burns and carbon monoxide poisoning. Her body was almost totally covered with third-degree burns. Her clothing and hair had mostly burned off. Portions of her skin "had burst open as a result of the buildup of heat in the tissues of the body." Lutz's body had been, essentially, cooked "in a metal container just as if it were in an oven." Her soot-covered body emitted a petroleum odor. Lutz had no alcohol in her system, nor had she eaten recently.

{¶ 12} An arson investigator estimated that the flames could have heated the trunk to over 550 degrees, which could cause combustibles there to ignite and catch fire. There were no holes in the trunk, but there was a puncture in the gas tank. Investigators found a gas cap under the driver's seat and a tire iron and cross bar in the back seat. Several samples of materials taken from inside the car tested positive for kerosene.

{¶ 13} Police detective Ray Riley traced the car to Carol Lutz and learned that she had last been seen with Wilson at the Empire Tavern. On May 9, police took Wilson into custody. Riley interviewed Wilson after advising him of his *Miranda* rights. Wilson waived his rights and agreed to talk with the police. Riley tape-recorded the interview. Wilson confessed to keeping Lutz locked in the trunk of the Oldsmobile

intermittently from 7:30 a.m. on May 4 until the time of her death. It appears that around 1:30 p.m., he killed her by setting the Oldsmobile on fire.

{¶ 14} The grand jury indicted Wilson on three aggravated murder counts. Count I charged aggravated murder by prior calculation and design; Count II charged felony-murder (kidnapping); and Count III, as amended, charged felony-murder (aggravated arson). Each murder count had three death specifications. Specification one charged murder to escape "detection, apprehension, trial, or punishment" for kidnapping, specification two charged murder during kidnapping, and specification three charged murder during an aggravated arson. Wilson was also indicted for kidnapping (Count IV) and aggravated arson (Count V).

{¶ 15} Wilson defended himself at trial by claiming intoxication and lack of prior calculation and design. The jury found Wilson guilty on all counts.

### Penalty Phase

{¶ 16} At the penalty phase, the prosecutor elected to proceed to sentencing only on Count I, prior calculation and design, and specification one, evading detection or punishment for another offense in violation of R.C. 2929.04(A)(3). Accordingly, neither the court nor jury considered the other two murder counts or the felony-murder death penalty specifications in assessing the penalty.

{¶ 17} At the outset of the defense's case, a forensic toxicologist explained the effect that alcoholism has on a person's body, mind, and behavior. Linda Wilson, Wilson's mother, David Wilson, his younger brother, and Wilson's grandfather and aunt testified as to his childhood. Wilson's parents had two other sons, Donald and David; Wilson was the middle child.

{¶ 18} Wilson's alcoholic father brutalized his wife and three sons throughout Wilson's childhood. Wilson's father would lock his sons in their bedroom at night and refuse to let them out, even to go to the bathroom. The father teased and belittled his sons. In drunken rages, Wilson's father would call his sons, "liars, cheats, and thieves," accuse them of stealing things he could not find, and hit them on their bare backsides

with a leather belt. Linda Wilson testified that her husband frequently slapped and terrorized her. When Wilson was twelve, he was arrested for the vandalism of a friend's house. A year or so later, his mother moved out of the family home. She took Donald with her, and left Wilson and David with their father.

{¶ 19} Wilson's father did not properly care for his sons, omitting even to buy food. Wilson and David were forced to steal to survive. They regularly broke into neighbors' homes to steal food or money. When he was fourteen, Wilson broke into a neighbor's house. When the neighbor surprised him, Wilson struck the elderly man, causing him to fall and break his hip. Wilson then ripped the phone cord out of the wall and left. The neighbor was not found for two days and died as a result of his injuries and the passage of time.

{¶ 20} A juvenile court adjudged Wilson delinquent by reason of involuntary manslaughter and remanded him to the custody of the Department of Youth Services. Wilson spent one year in a state facility for serious offenders, and then went to a halfway house. He fared well at both facilities. Although Wilson was initially reluctant to accept responsibility for his neighbor's death, he did so eventually.

{¶ 21} Days before reaching the age of seventeen, Wilson went to live with Shirley Spinney, a foster parent. Wilson adjusted well to living with Spinney. He graduated from high school, with a B average, and worked part-time while in school. After high school, Wilson continued to live with Spinney even after released from the custody of Youth Services. Wilson attended college for two semesters while continuing to work. Spinney described Wilson as incredibly compassionate, sensitive and considerate. Ultimately, Spinney discovered Wilson had a serious drinking problem. At times, he got very drunk and would call her, and she would get him and take him home.

{¶ 22} In 1988, Spinney's other foster child, Mark, was killed in an accident. Wilson was devastated by Mark's death and he began to drink more heavily. His girlfriend noted that Mark's death had a strong impact on Wilson and that he seemed

like a different person when he was drinking. The next year, Wilson left Spinney's home to live with friends. He next moved in with his mother and grandfather, sleeping in a camper behind their house. While there, he attempted to expunge his juvenile record and made plans to join the Navy.

{¶ 23} In an unsworn statement, Wilson asserted that his father "could do no wrong" in his eyes. In spite of all the terrible things his father had done, he liked and spent a lot of time with him. Wilson described his juvenile arrest and his incarceration. He also described the positive influence of Spinney and the progress he made while living with her. Wilson stated that after Mark died, he gave up on life. He denied that he "intended to hurt" Lutz, and said, "I still do not know why I reacted the way I did." He "would like to say to her family [he is] sorry." Wilson said he did not want to die, and asked for another chance at life.

{¶ 24} Dr. James Eisenberg, a psychologist, examined Wilson and made the following findings. Wilson is above average in intelligence and has difficulty becoming emotionally involved with others. Wilson's lifestyle was marked by "strong dependency needs, maladjustment and chaos." He suffered from alcohol dependence and a "mixed personality disorder with borderline and antisocial features." Wilson was the product of a "classic dysfunctional family marked by physical, emotional and psychological abuse," but he still identified with his father, not his "battered" mother. Wilson knew right from wrong, and his ability to conform to the law was not impaired. Wilson could adjust and function in an institutional setting.

{¶ 25} In rebuttal, Martha Lutz, Carol's mother, testified about the devastating impact of Carol's death on the family. They had been very close and had done many things together, including shopping together frequently. Martha stated that she has a "broken heart that's never going to heal" and misses Carol a lot, since "[s]he was our only daughter."

{¶ 26} The jury recommended the death penalty. The trial court agreed and sentenced Wilson to death for aggravated murder and imprisonment for the kidnapping

and aggravated arson. The court of appeals affirmed the convictions and death sentence.

{¶ 27} The cause is now before this court upon an appeal as of right.

_____

*Gregory A. White*, Lorain County Prosecuting Attorney, for appellee.

*David H. Bodiker*, Ohio Public Defender, *Linda E. Prucha* and *Joseph A. Wilhelm*, Assistant Public Defenders, for appellant.

_____

**WRIGHT, J.**

{¶ 28} We are required by R.C. 2929.04(A) to review Wilson's twenty-eight propositions of law. Many of these legal issues have been decided in prior cases and will be handled summarily. *State v. Poindexter* (1986), 36 Ohio St.3d 1, 3, 520 N.E.2d 568, 570. We must also make an independent review of the record to determine whether the aggravating circumstance outweighs the mitigating factors beyond a reasonable doubt. Finally, we must decide whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases.

{¶ 29} For the reasons set forth below, we affirm the convictions and sentence of death.

# I

## Voir Dire / Jury Issues

{¶ 30} In his first proposition of law, Wilson argues that the trial court denied him due process by not allowing him to individually voir dire prospective jurors about specific mitigating factors. Wilson argues he should have been allowed to ask what each prospective juror thought about each of several statutory mitigating factors (R.C. 2929.04 [B][1]-[4]) as well as fourteen individually tailored "other factors."

{¶ 31} Wilson relies strongly on *Morgan v. Illinois* (1992), 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492. In *Morgan*, the United States Supreme Court held that the trial court, at an accused's request, must ask prospective jurors about their views on

capital punishment in an attempt to ascertain whether any of them would automatically vote for the death penalty regardless of the circumstances. The court held that the voir dire was inadequate to detect such jurors and reversed the death sentence. An earlier United States Supreme Court decision had held that asking jurors whether they were opposed to the death penalty did not violate an accused's constitutional rights. *Lockhart v. McCree* (1986), 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137.

{¶ 32} In a recent case the United States Supreme Court held that a trial judge's refusal to voir dire individual jurors about the contents of news reports each juror had read did not violate the Constitution. *Mu'Min v. Virginia* (1991), 500 U.S. 415, 111 S.Ct. 1899, 114 L.Ed.2d 493. The court stated that a trial court has "great latitude in deciding what questions should be asked on voir dire." *Mu'Min*, 500 U.S. at 424, 111 S.Ct. at 1904, 114 L.Ed.2d at 505. See Annotation (1994), 114 L.Ed.2d 763. Deciding "issues raised in voir dire in criminal cases has long been held to be within the discretion of the trial judge." *State v. Beuke* (1988), 38 Ohio St.3d 29, 39, 526 N.E.2d 274, 285. See *Rosales-Lopez v. United States* (1981), 451 U.S. 182, 101 S.Ct. 1629, 68 L.Ed.2d 22.

{¶ 33} We find no abuse of discretion in this case. Here, the trial court allowed individual voir dire in the death-qualification process. The trial judge asked the prospective jurors approximately twenty questions about their views on capital punishment, the basis of those views, their willingness to consider mitigating evidence, the death penalty, and their commitment to follow instructions as given. The trial court also allowed counsel to inquire into these matters.

{¶ 34} *Morgan* does not require judges to allow individual voir dire on separate mitigating factors. The detailed questioning that occurred in this case was adequate to expose faults that would render a juror ineligible. See *State v. Rogers* (1985), 17 Ohio St.3d 174, 17 OBR 414, 478 N.E.2d 984, paragraph three of the syllabus. *Morgan* imposes no further requirements on voir dire.

**{¶ 35}** Moreover, we have rejected past efforts to find an abuse of discretion in similar circumstances. See *State v. Bedford* (1988), 39 Ohio St.3d 122, 129, 529 N.E.2d 913, 920. "Jurors weigh mitigating factors together, not singly, and do so collectively as a jury in the context of a penalty hearing. Realistically, jurors cannot be asked to weigh specific factors until they have heard all the evidence and been fully instructed on the applicable law." *State v. Lundgren* (1995), 73 Ohio St.3d 474, 481, 653 N.E.2d 304, 315. Further, a juror need not give any weight to any particular mitigating factor although instructed to consider such factors. "[E]vidence of an offender's history, background and character" not found mitigating "need be given little or no weight against the aggravating circumstances." *State v. Stumpf* (1987), 32 Ohio St.3d 95, 512 N.E.2d 598, paragraph two of the syllabus. See *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph two of the syllabus. We find that Wilson's first proposition of law lacks merit.

**{¶ 36}** In his fourth proposition of law, Wilson argues that the trial court erred in allowing the prosecutor to ask questions about "victim's rights" during general voir dire. At various times, the prosecutor asked jurors about their "perceptions" of the criminal justice system. He followed up by asking whether any jurors had heard or thought about "victim's rights" and what their thoughts were on that subject. The prosecutor's questions were deliberately brief, open-ended, and nonjudgmental. He did not attempt to explain "victim's rights," indoctrinate the jurors, inflame the jurors, or improperly appeal to community sentiment.

**{¶ 37}** We do not find these limited voir dire questions to be improper. Newspapers and other media frequently discuss the criminal justice system and "victim's rights." Such limited, open-ended questions could uncover biased or unsuitable jurors. Trial judges have discretion over voir dire and are not required to exclude all possibly controversial topics. *State v. Bedford*, 39 Ohio St.3d at 129, 529 N.E.2d at 920; *Rosales-Lopez v. United States, supra.* The trial court did not abuse its

discretion by allowing the prosecutor's limited questioning about the criminal justice system or "victim's rights."

{¶ 38} In his tenth proposition of law, Wilson argues that the prosecutor "destroyed the presumption of innocence" and "asked the jurors during voir dire to commit themselves to the *** death penalty." Viewed in the context of the entire voir dire, the prosecutor's questions were not an attempt to destroy Wilson's presumption of innocence. Instead, the prosecutor tried to determine whether jurors could recommend the death penalty *if* the accused were convicted as charged, *and if* the aggravating circumstance were found to outweigh the mitigating factors. Although the prosecutor inartfully used the terms "presume" and "presuming" in connection with guilt, Wilson did not object and therefore waived that issue. Moreover, the context shows that the prosecutor meant "assume" and "assuming," not "presume" and "presuming." The trial court fully instructed the jury on the accused's presumption of innocence. The state's imprecise language did not affect that presumption.

{¶ 39} The prosecutor did not wrongfully attempt to commit jurors to imposing the death penalty. Instead, the prosecutor attempted to discover whether a juror could, in an actual case and not on an abstract level, sign a death penalty verdict if that juror found that the aggravating circumstance outweighed the mitigating factors. As the trial court noted, "the point *** is can jurors distinguish between that which is philosophical and abstract and that which is real." Such questions are proper; thus, we reject Wilson's tenth proposition of law. *State v. Lorraine* (1993), 66 Ohio St.3d 414, 424-425, 613 N.E.2d 212, 221; *State v. Evans* (1992), 63 Ohio St.3d 231, 249-250, 586 N.E.2d 1042, 1057-1058.

{¶ 40} In his ninth proposition of law, Wilson argues that the trial court erred in not granting a change of venue or allowing sufficient voir dire to identify biased jurors. Yet, Wilson failed to show any basis for a change in venue. Moreover, the trial court adequately and individually questioned jurors on pretrial publicity, and Wilson's counsel had ample opportunity to inquire further. Of the jurors that sat, only three had

read or heard anything beyond headlines or TV reports, and none had an opinion about the accused's guilt. Finally, "[a]ny decision on changing venue rests largely in the discretion of the trial court." *State v. Landrum* (1990), 53 Ohio St.3d 107, 116, 559 N.E.2d 710, 722. Thus, we find Wilson's ninth proposition of law lacks merit.[1]

{¶ 41} In his eleventh proposition of law, Wilson contends that the trial court improperly used the *Wainwright* constitutional standard to death-qualify the jury. *Wainwright v. Witt* (1985), 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841. However, the trial court correctly used the *Wainwright* standard. See *State v. Tyler* (1990), 50 Ohio St.3d 24, 30, 553 N.E.2d 576, 586; *State v. Scott* (1986), 26 Ohio St.3d 92, 96-97, 26 OBR 79, 83, 497 N.E.2d 55, 59-60; *State v. Rogers*, 17 Ohio St.3d 174, 17 OBR 414, 478 N.E.2d 984, paragraph three of the syllabus.

{¶ 42} In his twelfth proposition of law, Wilson argues that the trial court erred in rejecting challenges to prospective jurors Sibley and Clutter and juror Edwards. The standard of review in this respect is that "'[d]eference must be paid to the trial judge who sees and hears the juror.' *** We will not overrule his decision absent an abuse of discretion." *State v. Tyler,* 50 Ohio St.3d at 30, 553 N.E.2d at 586. We have reviewed the transcript and find no abuse of discretion.[2]

---

1. All jurors denied knowledge of the events at issue in the trial, except as indicated. Beere, "headlines" only; Edwards, heard and saw "something about it"; Schlegelmilch, "read a little bit," but had no opinion; Schuller, "read some articles," but had no opinion; Perez, "haven't followed it much" ; Barnes, recalled hearing about it "[a] long time ago."

2. Wilson's counsel asked Sibley what factors he would like to know about an accused before deciding on the sentence. Sibley replied he would "like to know about the crime" and that "would be the deciding factor" or "main thing." It isn't possible for a prospective juror to know what, if any, mitigating factors are to be considered before being accepted as a juror. Sibley stated he would follow the court's instructions and not his personal views, would fairly consider mitigating factors, and would consider penalties other than death if the evidence warranted. We find that no basis for challenge existed.

Wilson's counsel objects to Clutter because Clutter had read about the case, and at some point became "too disgusted" to read further. Clutter stated she could not understand "why in the world anybody would burn anybody." Clutter also stated that she had "no idea what happened" and thus had no opinion as to the guilt or innocence of Wilson. She stated that she would not "judge anybody until" she "hear[s] everything." She agreed to set aside any feelings of disgust, to follow the court's instructions, and to consider mitigating evidence and penalties other than the death penalty. The court did not abuse its discretion in rejecting Wilson's challenge to Clutter.

**{¶ 43}** In his thirteenth proposition of law, Wilson argues that the prosecutor peremptorily excused prospective juror Bruce on racial grounds. Obviously, jurors cannot be excused based on racial considerations. *Batson v. Kentucky* (1986). However, the prosecutor explained in race-neutral terms that he challenged Bruce based on Bruce's equivocation about the death penalty. The record supports the state's claim. When asked if he would fairly consider that penalty, Bruce said, "Yes, I guess. I'm not sure about that." When asked whether he could sign a death verdict, Bruce replied, "I really don't know." In response to the same line of questioning he said, "I think so" and "I can't say I can. I guess if I have the evidence and listen to the evidence, I could." In the face of such responses, the prosecutor's peremptory challenge was appropriate. Wilson's thirteenth proposition of law lacks merit. See *State v. Hernandez* (1992), 63 Ohio St.3d 577, 589 N.E.2d 1310.

**{¶ 44}** In proposition of law fourteen, Wilson argues that the trial court erred when the court passed out notebooks and told jurors they could take notes during the trial. Wilson did not object to the notetaking or the jury instructions on notetaking thereby waiving all but plain error. A trial court can exercise its discretion and allow jurors to take notes. See *State v. Loza* (1994), 71 Ohio St.3d 61, 74, 641 N.E.2d 1082, 1099; *State v. Williams* (1992), 80 Ohio App.3d 648, 610 N.E.2d 545. The court adequately instructed the jury and emphasized that notes were to assist the jury, not a primary objective; that taking notes should not distract the juror from paying close attention to the ongoing testimony; and that "[y]our primary objective is to hear evidence and testimony as it comes to you from the witness stand." Thus, we find no

---

Edwards expressed concern over her absence from a family business in the event she was sequestered for "a week or something." She said, "[I]f it's more than a couple of days, it's going to be a problem." She also stated, "As long as I go home at night that's okay." She promised not to think about her business "in this courtroom" and to "give this case" her "full attention." She promised to "be here and listening" during all court sessions. Again, the court did not abuse its discretion by rejecting this challenge.

plain error with respect to the notetaking by the jurors and reject Wilson's proposition of law fourteen.

## II

### Evidence Issues

{¶ 45} In his eighth proposition of law, Wilson argues that the trial court erred by not suppressing his confession. He claims that he asked for an attorney and didn't receive one, that his confession was involuntary, and that his mental faculties were impaired at the time of his confession. The recorded interviews indicate that Detective Riley advised Wilson of his *Miranda* rights and that Wilson waived those rights and agreed to talk with the police. Wilson claims that he asked for a lawyer when the recorder was turned off, that Riley promised to help him if he confessed, and that Riley threatened Wilson with the "electric chair" if he did not confess. Riley denied all of these claims. Wilson said he had had a beer and smoked two marijuana cigarettes earlier that afternoon, but Riley found Wilson alert and in control of his mental faculties.

{¶ 46} "[T]he weight of the evidence and credibility of witnesses are primarily for the trier of the facts. *** This principle is applicable to suppression hearings as well as trials." *State v. Fanning* (1982), 1 Ohio St.3d 19, 20, 1 OBR 57, 58, 437 N.E.2d 583, 584. The trial court specifically found in its entry denying Wilson's motion to suppress that Wilson "knowingly and intelligently waived his right against self-incrimination" and that his statements "were voluntarily made." Further, the accused's asserted intake of one beer and "two joints" did not prevent him from being able to make "a knowing, voluntary and intelligent waiver of his rights." Further the trial court found that Wilson never invoked his right to counsel "[d]ue to the inconsistencies" in his testimony. The taped interviews and testimony support those findings. *State v. Mills* (1992), 62 Ohio St.3d 357, 366, 582 N.E.2d 972, 982; *State v. Smith* (1991), 61 Ohio St.3d 284, 288, 574 N.E.2d 510, 515. Accordingly, we reject Wilson's eighth proposition of law.

**{¶ 47}** In proposition of law fifteen, Wilson argues that the trial court erred in admitting prejudicial "other acts" testimony from Angie Shelton and Darlene DeBolt. On the evening of May 3, Wilson had argued with Shelton, his girlfriend, and threatened to hit her. On May 4, around 6:00 a.m., Wilson dropped by the gas station where DeBolt worked and tried to get her to go out with him. We find no prejudicial error in the trial court's decision to allow the testimony of these witnesses.

**{¶ 48}** The state contended that Wilson's motive in kidnapping Lutz was, at least in part, his inability to deal with female rejection. The fact that, just before meeting Lutz, Wilson had argued with Shelton and threatened to hit her after she rejected him arguably supports that claimed motive. Under Evid.R. 404(B), evidence of other acts, though criminal, may be admissible as "proof of motive." See *State v. Woodard* (1993), 68 Ohio St.3d 70, 73, 623 N.E.2d 75, 78.

**{¶ 49}** DeBolt's testimony was clearly admissible. DeBolt placed Wilson in Lutz's Oldsmobile between 6:00 a.m. and 7:00 a.m. on May 4, corroborating that part of Wilson's confession. DeBolt describes Wilson as "persistent" and "pushy" and thus never raises an "other acts" issue. In view of the overwhelming evidence of Wilson's guilt, especially his voluntary confession, the testimony of neither witness materially prejudiced Wilson. Thus, we reject his fifteenth proposition of law.

**{¶ 50}** In proposition of law sixteen, Wilson argues that the trial court erred by admitting "cumulative, gruesome and inflammatory" photographs of the victim and crime scene. These photos were also reproduced and shown as slides. Under Evid.R. 403 and 611(A), the admission of photographs is left to the trial court's sound discretion. *State v. Slagle* (1992), 65 Ohio St.3d 597, 601, 605 N.E.2d 916, 923. Nonrepetitive photographs in capital cases, even if gruesome, are admissible as long as the probative value of each photograph outweighs the danger of material prejudice to an accused. See *State v. Maurer* (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph seven of the syllabus; *State v. Morales* (1987), 32 Ohio St.3d 252, 257, 513 N.E.2d 267, 273.

**{¶ 51}** The trial court properly admitted these photographs and slides. The two photographs of Lutz's body illustrate the coroner's testimony, are nonrepetitive, and each has probative value greater than any prejudicial effect. Two other photographs, also admissible, show Lutz's body at the scene after the fire was extinguished. Both photographs illustrate testimony and help to demonstrate Wilson's intent and the extent of Lutz's injuries. The remaining photographs under objection are relevant, nonobjectionable, and not even gruesome, since they do not contain a body. See *State v. DePew* (1988), 38 Ohio St.3d 275, 281, 528 N.E.2d 542, 550-551. Thus, we find that proposition of law sixteen lacks merit.

**{¶ 52}** In proposition of law seventeen, Wilson argues plain error, contesting the admission of testimony from the coroner and three witnesses who were at the scene of the burning car. The coroner testified about Lutz's injuries and confirmed that carbon monoxide and third degree burns had caused her death. Patton described the fire and the pictures she had taken of the burning car, helping to confirm the fire's origin and intensity. The paramedic described the fire and his confirmation at the scene that no one was in the passenger compartment of the car. A fire department captain described the fire fighting efforts, the car's damage, and the body in the trunk.

**{¶ 53}** Wilson did not object to these witnesses at trial, thereby waiving this issue absent plain error. The testimony from these witnesses was relatively brief, relevant, and not unfairly prejudicial to the accused under Evid.R. 403(A), which states that even relevant evidence must be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice *** ." The overwhelming evidence of Wilson's guilt, including his confession, precluded any material prejudice from this factual testimony. Wilson did object to the photos and a few questions that were asked of the coroner, but those objections lack merit.

**{¶ 54}** Wilson offered, at the last moment, to stipulate to the victim's identity; the state did not agree to the stipulation. Testimony from two dentists establishing

Lutz's identity was proper, nonprejudicial, and not inflammatory. Thus, we find Wilson's claim of error, with respect to these witnesses, lacks merit.

## III

## Guilt Phase Instructions

{¶ 55} In propositions of law eighteen, nineteen, twenty, twenty-one, and twenty-five, Wilson argues that the trial court erred in giving guilt phase instructions. Wilson failed to object at trial to the instructions he now contests in propositions of law eighteen and nineteen. He also failed to object with specificity to the instruction contested in proposition of law twenty-five. Thus, he waived all but plain error. *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus. We find no plain error as to those issues. As to proposition twenty, Wilson argues correctly that the trial court erred in shifting the burden of proof as to "knowledge." Except on that point, Wilson's propositions twenty and twenty-one also lack merit.

{¶ 56} In proposition of law eighteen, Wilson argues plain error because the trial court instructed, "[t]he purpose with which a person does an act or brings about a result is determined from the manner in which it is done, the means used and all of the other facts and circumstances in evidence." We reject Wilson's claim that these words relieved the prosecutor of his burden of proof or created a mandatory presumption. *State v. Montgomery* (1991), 61 Ohio St.3d 410, 414-415, 575 N.E.2d 167, 171-172; *State v. Price* (1979), 60 Ohio St.2d 136, 141, 14 O.O.3d 379, 382, 398 N.E.2d 772, 775.

{¶ 57} The court further instructed that no one "may be convicted of Aggravated Murder unless he's specifically found to have intended to cause the death of another." The instructions on prior calculation and design also amplified the court's instructions on "purpose." When the instructions are viewed in context, Wilson's claim of error, plain or otherwise, lacks merit.

{¶ 58} In proposition of law nineteen, Wilson argues plain error because of the trial court's following definitions of "purpose" which Wilson contends are

"incongruous": "A person acts purposely when it is his specific intention to cause a certain result. It must be established in this case that at the time in question there was present in the mind of the Defendant a specific intention to cause the death of another. *** A person acts purposely, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, if it is his specific intention to engage in conduct of that nature."

{¶ 59} Admittedly, the "gist of the offense" language is confusing in a murder prosecution which requires "purpose." See *State v. Carter* (1995), 72 Ohio St.3d 545, 552-553, 651 N.E.2d 965, 973-974; R.C. 2901.22(A); 4 Ohio Jury Instructions (1995) 52, 409.01(3)(Comment). In the context of all the instructions given the jury, the court provided adequate instructions on the element of specific intent to kill. *State v. Price*, 60 Ohio St.2d at 140-141, 14 O.O.3d at 381-382, 398 N.E.2d at 775; *State v. Martens* (1993), 90 Ohio App.3d 338, 349-350, 629 N.E.2d 462, 469-470. Given the evidence, including Wilson's confession, the jury could not have based its decision on the "gist of the offense" language. No "outcome-determinative" plain error occurred. We, therefore, reject proposition of law nineteen.

{¶ 60} In proposition of law twenty, Wilson first argues that the trial court erred in refusing his request to instruct the jury on intoxication as it relates to aggravated murder and arson. Whether to instruct on intoxication as a defense rests within a trial court's sound discretion. *State v. Wolons* (1989), 44 Ohio St.3d 64, 541 N.E.2d 443, paragraph two of the syllabus; *State v. Fox* (1981), 68 Ohio St.2d 53, 22 O.O.3d 259, 428 N.E.2d 410; *Nichols v. State* (1858), 8 Ohio St. 435, paragraph two of the syllabus. Such an instruction is not required, since "[i]ntoxication is easily simulated" and is "often voluntarily induced for the sole purpose of nerving a wicked heart[.]" *Nichols*, 8 Ohio St. at 439. As discussed *infra*, the court did instruct on intoxication as to the kidnapping offense and specifications.

{¶ 61} Moreover, the evidence does not reasonably raise the intoxication issue as to the aggravated murder or arson. Wilson cites much evidence from the trial to

show how much alcohol he drank up to 2:30 a.m. on May 4. However, aside from one or two beers at his trailer around 3:00 a.m., there was no evidence at trial that indicated Wilson drank anything after that time. The murder occurred around 1:30 p.m., eleven hours after the Empire Tavern closed and at least eight hours after Wilson's last beer. During this time, Wilson walked, slept, drove to various places, and talked with DeBolt at 6:00 a.m. in Stow for sixty to ninety minutes. His own confession reflects that he knew exactly what he was doing after 7:30 a.m. Lacking evidence of intoxication, the court did not err in declining to instruct on intoxication as to the events that directly preceded Lutz's death. See *State v. Hicks* (1989), 43 Ohio St.3d 72, 538 N.E.2d 1030, syllabus.

**{¶ 62}** In proposition of law twenty, Wilson further argues that the trial court erred in instructing the jury, over objection, that he had the burden of proof to establish that his intoxication negated the "knowledge" element in the kidnapping. This contention relates solely to the kidnapping conviction. Wilson makes no claim that any error affects the remaining charges or the death penalty.

**{¶ 63}** The court instructed: "Intoxication is not an excuse ***, [but] such evidence is admissible for the purpose of showing that the Defendant was so intoxicated that he was incapable of having the knowledge to commit the offense of Kidnapping. Knowledge is the element of this offense; and intoxication *** can co-exist with knowledge. *** On this issue, *the burden of proof is upon the Defendant* to establish by a preponderance or greater weight of the evidence that at the time in question he was so influenced by alcohol that he was incapable of having the knowledge to commit the offense. If you *find by a preponderance or greater weight* of the evidence that the Defendant was *incapable of having the knowledge* to commit the offense, then you must find the Defendant was not guilty of the offense of Kidnapping because Knowledge is an essential element of the offense[,] as I have previously instructed you." (Emphasis added.)

18

{¶ 64} As the court instructed, "knowledge" is an element of kidnapping. Due process requires the prosecution to prove, beyond a reasonable doubt, every element of the crime charged. *In re Winship* (1970), 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368. Due process prohibits requiring an accused to disprove an element of the crime charged. *Mullaney v. Wilbur* (1975), 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508. This instruction is unconstitutional under *Winship* because it required Wilson to disprove "knowledge," which is an element of the offense of kidnapping. R.C. 2905.01(B). The burden of proof cannot be placed on a defendant to disprove an element of an offense. *Mullaney, supra.* Nevertheless, we find the error to be harmless under the facts of this case since the kidnapping of Lutz continued into the late morning and early afternoon. At that point, he clearly knew what he was doing and intoxication would not reasonably be available as a defense to negate "knowledge."

{¶ 65} No other offenses are affected by this instructional deficiency, since this instruction on intoxication involved only the kidnapping. The felony-murder counts and kidnapping penalty specifications played no role at all in the penalty phase. The death penalty was imposed solely on Count I and specification one.

{¶ 66} In proposition of law twenty-one, Wilson argues that the trial court erred in refusing his request to instruct on murder as a lesser included offense. However, a charge on a "lesser included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense." *State v. Thomas* (1988), 40 Ohio St.3d 213, 533 N.E.2d 286, paragraph two of the syllabus. Here the evidence did not reasonably raise murder as a lesser included offense.

{¶ 67} No evidence exists that indicates that Wilson had anything to drink after approximately 2:30 a.m. Wilson knew Lutz was locked in the trunk at 7:30 a.m. In the hours after that, he drove and walked around, kept Lutz locked in the trunk, and thought about what he was going to do. It appears that by 1:00 p.m., he had decided to kill her and to that end set fire to a rag stuffed into the gas tank. That time, the fire

went out. He next let Lutz out of the trunk and talked with her for fifteen to twenty minutes before forcing her back in the car trunk. This time he punctured the gas tank before lighting the rag. The fire caught and Lutz was burned to death. Evidence of prior calculation and design is overwhelming, and a jury could not reasonably find him guilty of murder but not guilty of aggravated murder. Thus, the trial judge did not err in refusing to instruct on murder as a lesser included offense. See *State v. Evans*, 63 Ohio St.3d at 245, 586 N.E.2d at 1054-1055; *State v. Tyler*, 50 Ohio St. 3d at 36, 553 N.E.2d at 591.

{¶ 68} We summarily reject Wilson's proposition of law twenty-five, which challenges Ohio's statutory reasonable doubt instruction used at the guilt and penalty phases. *State v. Van Gundy* (1992), 64 Ohio St.3d 230, 594 N.E.2d 604; *State v. Nabozny* (1978), 54 Ohio St.2d 195, 8 O.O.3d 181, 375 N.E.2d 784, paragraph two of the syllabus. Moreover, it should be noted that Wilson failed to object and waived the issue. *State v. Underwood*, 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus; Crim.R. 30(A).

## IV

### Effective Assistance of Counsel

{¶ 69} In proposition of law twenty-four, Wilson argues that he was denied his right to the effective assistance of counsel at trial. Wilson did not raise this claim before the court of appeals and thus waived this issue. *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364. Moreover, reversal of convictions on ineffective assistance requires that the defendant show, first, "that counsel's performance was deficient"and, second, "that the deficient performance prejudiced the defense *** so *** as to deprive the defendant of a fair trial." *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373.

{¶ 70} Wilson challenges his counsel's decisions on numerous issues. We find that each of those decisions was the product of reasonable professional judgment.

Additionally, as to all of these issues, Wilson has not established prejudice, *i.e.*, "a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *Bradley*, paragraph three of the syllabus. Thus, we find that proposition of law twenty-four lacks merit.

## V

### Constitutional Issues

{¶ 71} Proposition of law twenty-two challenges the death-penalty felony-murder provisions, but it lacks both merit and relevance. *State v. Henderson* (1988), 39 Ohio St.3d 24, 528 N.E.2d 1237, paragraph one of the syllabus. Wilson's arguments in proposition of law twenty-seven challenging Ohio's proportionality review lack merit. *State v. Green* (1993), 66 Ohio St.3d 141, 151, 609 N.E.2d 1253, 1261; *State v. Steffen*, 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph one of the syllabus. We summarily reject Wilson's constitutional arguments in propositions of law twenty-two, twenty-seven and twenty-eight. *State v. Poindexter*, 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus.

## VI

### Sentence Issues

{¶ 72} In his second proposition of law, Wilson challenges the constitutionality of appellate sentence reweighing in death penalty cases and seeks to sharply restrict the use of appellate reweighing to determine sentence appropriateness. Wilson further argues that appellate reweighing is speculative and improper when an error is based upon inadmissible evidence. However, we find Wilson's second proposition of law lacks merit.

{¶ 73} At the sentencing proceedings, the jury and judge became aware that Wilson had been earlier adjudged a delinquent child for an involuntary manslaughter. Wilson starts his arguments against reweighing with the erroneous assumption that the court improperly admitted evidence of his juvenile criminal history. The trial transcript demonstrates that Wilson mentioned his juvenile record and introduced evidence of

that record at sentencing. Having invited any error, he cannot now complain. *Center Ridge Ganley, Inc. v. Stinn* (1987), 31 Ohio St.3d 310, 31 OBR 587, 511 N.E.2d 106. The trial jury properly considered the defense evidence. See discussion of Wilson's fifth proposition of law, *infra*.

{¶ 74} However, we agree that the trial court in its sentencing opinion improperly injected Wilson's juvenile record into the weighing process as a nonstatutory aggravating circumstance. In justifying the death penalty, and explaining why the aggravating circumstance outweighed mitigating factors, the trial court stated: "Defendant's total disregard for the suffering of his victim(s) in the present case and in his juvenile adjudication finding him delinquent by reason of involuntary manslaughter. *** Defendant's actions in both cases support the aggravating circumstance in that defendant acted in order to prevent the victim from seeking assistance in order to avoid detection, apprehension, trial or punishment." The court of appeals recognized the trial court's error and took appropriate corrective action by independently reassessing the sentence.

{¶ 75} Wilson now challenges the authority of the court of appeals to reassess the sentence under the circumstances. Wilson argues that appellate reweighing is limited to situations where an aggravating circumstance has been subsequently ruled invalid under the Eighth Amendment. His argument lacks logic and is not based on precedent. "The independent weighing process at each appellate level *** provides a procedural safeguard against the arbitrary imposition of the death penalty." *State v. Holloway* (1988), 38 Ohio St.3d 239, 527 N.E.2d 831, paragraph two of the syllabus. We have upheld appellate reweighing in varied situations. See, *State v. Combs* (1991), 62 Ohio St.3d 278, 286, 581 N.E.2d 1071, 1079; *State v. Landrum*, 53 Ohio St.3d at 124, 559 N.E.2d at 729. This court has specifically used appellate reweighing to correct errors in a trial court's sentencing opinion. See *State v. Fox (1994)*, 69 Ohio St.3d 183, at 190-192, 631 N.E.2d 124 at 130-131; *State v. Lewis* (1993), 67 Ohio St.3d 200, 204, 616 N.E.2d 921, 925; *State v. Lott* (1990), 51 Ohio St.3d 160, 169-170, 555 N.E.2d

293, 303-304; *State v. Maurer*, 15 Ohio St.3d at 246-247, 15 OBR at 385-386, 473 N.E.2d at 777-778. Thus, we reject Wilson's second proposition of law.

{¶ 76} In his third proposition of law, Wilson argues that the trial court erred in instructing the jury, over objection, that "[m]itigating factors are factors that, while they do not justify or excuse the crime ***, may be considered by you as extenuating, lessening, weakening, excusing to some extent, *or* reducing the degree of the Defendant's *blame or culpability*." (Emphasis added.)

{¶ 77} We agree that the trial court erred in referring to only "blame or culpability" when explaining mitigating factors. As *State v. Holloway* held at paragraph one of the syllabus, "Mitigating factors *** are not necessarily related to a defendant's culpability but, rather, are those factors that are relevant to the issue of whether an offender convicted under R.C. 2903.01 should be sentenced to death." However, instructions must be considered as a whole, not in isolation. *State v. Price*, 60 Ohio St.2d 136, 14 O.O.3d 379, 398 N.E.2d 772. When considered in context, the trial court's instructions adequately informed the jury as to the relevant mitigating factors it must consider. The court told the jury that the "mitigating factors which you are to weigh include but are not limited to the youth of the offender; any other factor raised by the Defendant which may include, but is not limited to, that the Defendant is the product of a dysfunctional family; alcoholism; ability to adjust to a structural environment in an institutional setting; the Defendant's confession.

{¶ 78} "Likewise, the existence of any of the mitigating factors does not preclude or prevent the imposition of a sentence of death if you find that the aggravating circumstance still outweighs the mitigating factors by proof beyond a reasonable doubt.

{¶ 79} "If, after a full and impartial consideration of all the relevant evidence *** you are firmly convinced that the aggravating circumstance *** outweighs the factors in mitigation, beyond a reasonable doubt, then the state has met its burden of proof ***.

{¶ 80} "If, on the other hand, you are not firmly convinced that the aggravating circumstance *** outweighs the factors in mitigation, beyond a reasonable doubt, then the State has not met its burden of proof and the sentence of death shall not be imposed."

{¶ 81} Under the circumstances, we find no material prejudice resulted from use of the words "blame" or "culpability." Taken as a whole, the jury instructions indicate that the penalty phase was to determine Wilson's punishment, not just to assess his blame or culpability. See *State v. Woodard*, 68 Ohio St.3d at 77, 623 N.E.2d at 80. The arguments of counsel reflected that view. Additionally, our independent sentence reassessment eliminates the effect of this error. See *State v. Landrum*, 53 Ohio St.3d at 124, 559 N.E.2d at 729*; State v. Holloway*, 38 Ohio St.3d at 242, 527 N.E.2d at 835.

{¶ 82} Contrary to Wilson's arguments in proposition of law twenty-three, the trial court did not err in refusing to instruct on mercy. *State v. Lorraine*, 66 Ohio St.3d at 417, 613 N.E.2d at 216; *State v. Landrum*, 53 Ohio St.3d at 123, 559 N.E.2d. at 728.

{¶ 83} In his fifth proposition of law, Wilson argues that prosecutorial misconduct denied him a fair penalty determination. First, Wilson argues that the prosecutor improperly introduced Wilson's juvenile record into evidence and improperly cross-examined defense witnesses about that record. Wilson's argument obscures what occurred at trial.

{¶ 84} Before trial, the prosecutor stated that he might use Wilson's prior juvenile record "to cross-examine them [defense witnesses] regarding their knowledge of his record." Such a comment in a pretrial conference does not constitute use of the evidence before the jury. In fact, the record is clear that Wilson, as part of a reasoned defense strategy, disclosed his juvenile record in his opening statement at the sentencing proceedings and questioned his own witnesses about that juvenile record.

{¶ 85} Wilson's mitigation strategy involved numerous witnesses' testifying about his childhood. His juvenile record featured prominently in his mitigation case. Wilson was incarcerated at age fourteen, spent two years in institutions, and then lived

in a foster home. Wilson's "personality disorder" diagnosis depended upon a juvenile record. According to Wilson, his father's alcoholism and neglect directly caused his juvenile record.

**{¶ 86}** Having introduced the evidence himself, Wilson cannot now complain because the prosecutor cross-examined witnesses about his juvenile record or mentioned it in argument. See *State v. Montgomery*, 61 Ohio St.3d at 418, 575 N.E.2d at 173. "A party cannot take advantage of an error he invited or induced." *State v. Seiber (1990)*, 56 Ohio St.3d 4, 17, 564 N.E.2d 408, 422.

**{¶ 87}** Wilson's remaining prosecutorial misconduct arguments also lack merit. "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78, 87. "[T]here can be no such thing as an error-free, perfect trial, and \*\*\* the Constitution does not guarantee such a trial." *United States v. Hasting* (1983), 461 U.S. 499, 508-509, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96, 106.

**{¶ 88}** The prosecutor's cross-examination about people who kill strangers and Wilson's possible future conduct was not improper given Wilson's attempt to present himself as not dangerous when he was off alcohol. Wilson also did not always object so as to preserve any error. The prosecutor could discredit favorable defense childhood testimony by cross-examining witnesses about Wilson's childhood vandalism.

**{¶ 89}** Since Wilson first presented evidence that he adjusted well to imprisonment, the prosecution could properly cross-examine a defense witness about Wilson's attempt to escape from custody. The limited victim-impact testimony of Lutz's mother did not violate constitutional guarantees. Mrs. Lutz expressed no opinion about the penalty. *Payne v. Tennessee* (1991)*, 501 U.S. 808, 830, 111 S.Ct. 2597, 2611, 115 L.Ed.2d 720, 739, at fn. 2; *State v. Fautenberry,* 72 Ohio St.3d 435, 438, 650 N.E.2d 878, 881-882; see *State v. Lorraine*, 66 Ohio St.3d at 420-421, 613 N.E.2d at 218-219.

{¶ 90} Prosecutorial characterization of Wilson as a "walking time bomb" was not unreasonable under the testimony given. Prosecutors can be "colorful or creative." *State v. Brown* (1988), 38 Ohio St.3d 305, 317, 528 N.E.2d 523, 538. Prosecutors can urge the merits of their cause and legitimately argue that defense mitigation evidence is worthy of little or no weight. The prosecutor did not err by arguing that others with deprived childhoods do not necessarily commit such crimes. See *State v. Murphy* (1992), 65 Ohio St.3d 554, 570-571, 605 N.E.2d 884, 899; *State v. Richey* (1992), 64 Ohio St.3d 353, 370, 595 N.E.2d 915, 929. The trial court's sentencing instructions cured any asserted prosecutorial misstatements of law. *State v. Greer* (1988), 39 Ohio St.3d 236, 251, 530 N.E.2d 382, 400.

{¶ 91} With respect to Wilson's allegations about prosecutorial misconduct, we find that such misconduct did not permeate the trial, and that Wilson received a fair trial, if not a perfect one. Compare *State v. Landrum*, 53 Ohio St.3d at 110-112, 559 N.E.2d. at 716-718; *State v. Johnson* (1989), 46 Ohio St.3d 96, 101-103, 545 N.E.2d 636, 642-643. We therefore reject Wilson's fifth proposition of law.

{¶ 92} In his seventh proposition of law, Wilson argues that the trial court erred in failing "to consider and give effect to his relevant mitigating evidence." Wilson argues that the trial court's sentencing opinion did not give appropriate mitigating weight to his alcoholism, confession, adaptation to incarceration, and youth. However, the sentencing opinion shows that the court did consider all asserted mitigating factors. "[T]he assessment and weight to be given mitigating evidence are matters for the trial court's determination." *State v. Lott*, 51 Ohio St.3d at 171, 555 N.E.2d at 305. "[E]vidence of an offender's history, background and character which the *** trial court *** considered, but did not find to be mitigating, need be given little or no weight against the aggravating circumstances." *State v. Stumpf*, 32 Ohio St.3d 95, 512 N.E.2d 598, paragraph two of the syllabus. See, also, *State v. Steffen*, 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph two of the syllabus.

**{¶ 93}** The trial court's sentencing opinion indicates that the court correctly understood the weighing process and the prosecution's burden of proof. The court of appeals had earlier recognized and corrected the only notable error. Any imprecision in the trial court's opinion, as well as the minor mistake regarding the accused's age, was inconsequential. Also, our independent reassessment of the sentence cures any arguable error. *State v. Lott*, *supra*. Thus, we reject Wilson's proposition of law seven.

**{¶ 94}** Wilson, in proposition of law twenty-six, argues that the trial court erred in imposing prison sentences along with the death penalty. That claim lacks merit. *State v. Campbell* (1994), 69 Ohio St.3d 38, 52, 630 N.E.2d 339, 352. In addition, Wilson cannot now complain since he failed to object at trial. *State v. Williams,* 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364.

## VII

### INDEPENDENT SENTENCE ASSESSMENT

**{¶ 95}** In proposition of law six, Wilson argues that the death sentence is inappropriate for him. After independent assessment, we find that the evidence proves, beyond a reasonable doubt, the aggravating circumstance charged against Wilson, *i.e.*, that he killed Lutz "for the purpose of escaping detection, apprehension, trial, or punishment" for kidnapping Lutz. R.C. 2929.04(A)(3). We find nothing in the nature and circumstances of the crimes themselves to be mitigating.

**{¶ 96}** Wilson's history and background do provide some mitigating features. Until he was fourteen, Wilson suffered at the hands of a tyrannical, alcoholic father, who alternatively teased, beat, and neglected his sons. His mother could do little and ultimately abandoned him to his father. At fourteen, Wilson was adjudged delinquent, spent two years in an institutional setting, and then lived successfully in a foster home for four years. Undoubtedly, Wilson's "personality disorders" resulted in part from that deprived childhood. We find all of this entitled to some weight. However, its significance is undercut by the fact that, at about age seventeen, Wilson had an

opportunity for a fresh start in life, in a loving home, and he failed to follow through successfully. We find nothing in Wilson's character to be mitigating.

**{¶ 97}** We accord appropriate weight to the statutory mitigating factor of age. See R.C. 2929.04(B)(4). Wilson was twenty-one at the time of the offense. No other statutory mitigating factor in R.C. 2929.04(B)(1)-(3), (B)(5), or (B)(6) is raised by the evidence or applicable. As to R.C. 2929.04(B)(7), "other factors," Wilson's anti-social and borderline personality disorders, his alcoholism, his confession, and his adaptation to confinement collectively deserve some weight. However, Wilson confessed only after he was identified and taken into custody, and thus his confession is entitled to little weight. Personality disorders are often accorded little weight because they are so common in murder cases. Alcoholism is of little mitigating value here because, as we have previously discussed, Wilson's claim that he was drunk when he killed Lutz does not hold up under examination.

**{¶ 98}** In this case, the aggravating circumstance outweighs the combined mitigating factors beyond a reasonable doubt. Wilson acted in the full light of the afternoon, hours after waking up and thinking about his options. When weighed against this aggravating circumstance, the mitigating factors—his history, background, youth, alcoholism, and the "other factors" cited—are of minor consequence.

**{¶ 99}** The death penalty is both appropriate and proportionate when compared with similar capital cases. *State v. Lawson* (1992), 64 Ohio St.3d 336, 595 N.E.2d 902; *State v. Brewer* (1990), 48 Ohio St.3d 50, 549 N.E.2d 491; *State v. Stumpf*, 32 Ohio St.3d 95, 512 N.E.2d 598.

**{¶ 100}** The judgment of the court of appeals is affirmed.

*Judgment affirmed.*

MOYER, C.J., RESNICK, F.E. SWEENEY, PFEIFER and FARMER, JJ., concur.

DOUGLAS, J., concurs in judgment only.

SHEILA G. FARMER, J., of the Fifth Appellate District, sitting for Cook, J.

_____

January Term, 1996