THE STATE OF OHIO, APPELLEE, *v.* JACKSON, APPELLANT.

[Cite as *State v. Jackson*, 107 Ohio St.3d 300, 2006-Ohio-1.]

(No. 2003–0137—Submitted May 10, 2005—Decided January 4, 2006.)

LANZINGER, J.

{¶ 1} In the very early morning of December 12, 2001, Donna Roberts phoned 911 to report the shooting death of her former husband, Robert Fingerhut, at their home in Howland Township, Trumbull County, Ohio. Over the next few days, police learned that she and Nathaniel Jackson had plotted to kill Fingerhut. Both Roberts and Jackson were arrested, convicted of aggravated murder, and sentenced to death. This opinion addresses the appeal by defendant-appellant, Jackson.

{¶ 2} As evidence at trial showed, Roberts and Fingerhut had been divorced in 1985, but were living together in the Howland Township home. Almost all of the couple's assets, including two Greyhound bus terminals in Warren and Youngstown, were in Roberts's name. Fingerhut managed the terminals. Many of those who dealt with the couple assumed that they were married, and Fingerhut referred to Roberts as his wife in many business dealings.

{¶ 3} Donna Roberts and Nathaniel Jackson met and began having an affair sometime before 2001. Their romantic relationship was interrupted during most of 2001 while Jackson was incarcerated in the Lorain Correctional Institution. At the time of Fingerhut's murder, Jackson was 29 years old, Roberts was 57, and Fingerhut was 56.

{¶ 4} While Jackson was in prison, he and Roberts exchanged letters and spoke on the phone. Because phone calls from prisoners are routinely recorded at the Lorain Correctional Institution and kept for at least six months, there were digital recordings of 19 of their phone conversations. Many of the letters and conversations were sexually graphic, describing the couple's plans after Jackson's release. The couple used veiled terms in their letters and conversations to discuss how they would deal with Fingerhut once Jackson was out of prison.

{¶ 5} Three days before Jackson was released from prison on December 9, 2001, a woman reserved a Jacuzzi suite at the Wagon Wheel Motel in Youngstown. The woman paid for the room, and she and Jackson stayed there on the night of his release.

{¶ 6} For the next few days, Roberts and Jackson were seen together at various places. On the afternoon of December 10, Frank Reynolds, an employee of the Youngstown Greyhound bus terminal, saw Roberts and Jackson talking near the terminal before Fingerhut arrived for work. Later, Reynolds overheard Roberts ask Fingerhut for $3,000, which he refused to give her. According to Reynolds, Roberts was nervous and shaky and gave Fingerhut "the dirtiest look like it can kill a person."

{¶ 7} The next afternoon, December 11, the day of the murder, at approximately 4:35 p.m., bus driver Jim McCoy saw Fingerhut working alone at the Youngstown terminal. Shortly afterwards, McCoy drove his bus to the Warren bus terminal, where he saw Roberts with a black male who identified himself as "Nathaniel." According to McCoy, the two appeared to be in a hurry to leave.

{¶ 8} Shortly before 6:00 p.m. that evening, a waitress at the Red Lobster restaurant in Niles began serving Roberts and Jackson. The two paid for their dinner at 6:43 p.m. and left the restaurant.

{¶ 9} Fingerhut left the Youngstown bus terminal at 9:00 p.m., telling the security guard that he was going home.

{¶ 10} Near 9:30 p.m. the same evening, a neighbor of Roberts saw her driving near her home. Although no one else was on the road at the time, Roberts was driving very slowly. Meanwhile, Fingerhut left the Youngstown bus terminal at 9:00 p.m., telling the on-duty security guard, "I'm going home."

{¶ 11} Later that night, Roberts reserved a room for a week at the Days Inn Motel in Boardman. The room receipt indicates that she paid for the room at 11:33 p.m.

{¶ 12} Shortly after midnight, December 12, 2001, Roberts called 911 screaming that there was something wrong with her husband. The computer showed that the call came from Roberts and Fingerhut's home in Howland Township.

{¶ 13} These facts from the trial record are consistent with the state's theory that Roberts let Jackson into her home to wait for Fingerhut to return from work; that when Fingerhut got home, Jackson shot him and stole his car and then called Roberts's cell phone from the cell phone in Fingerhut's car; that Jackson abandoned Fingerhut's car, and Roberts picked him up and took him to Days Inn, where she reserved a room for a week; and that Roberts then went home and called 911.

{¶ 14} Upon arriving at the scene, police found Fingerhut's bloody corpse lying face down on the kitchen floor near the door to the garage. Roberts told police to do whatever they had to do to catch the killer. She also gave police permission to search the house and her car in the garage. She asked police several times where her "husband's car" was, but told police later that somebody had stolen it. Roberts's emotional state fluctuated. At times she was very coherent, while at other times she was screaming, crying, and asking police why they were not doing anything. Eventually, police arranged for Roberts's brother to come and get her while police continued to process the crime scene.

{¶ 15} The deputy coroner for Trumbull County, Dr. Humphrey Germaniuk, observed the victim at the crime scene and later performed an autopsy. Fingerhut had sustained lacerations and abrasions to his left hand and head, as well as three gunshot wounds: one to his head, a perforating wound that started at the right side of his back and went through his chest, and a grazing wound to the right side of his back. Germaniuk concluded that the gunshot to his head was fatal.

{¶ 16} During the search of the crime scene, police found a fully loaded .38–caliber revolver near Fingerhut's body. Near the gun was a bloody shoe print. A firearms expert with the Bureau of Criminal Identification and Investigation ("BCI") concluded that the bullets recovered from the crime scene and the victim had all been fired from the same weapon, but not from the one found at the scene.

{¶ 17} In a dresser in the master bedroom of the house, police discovered 145 letters and cards handwritten by Jackson to Roberts. Most were addressed to Roberts at a post office box in Warren.

{¶ 18} In the trunk of Roberts's car parked in the garage, police found a brown paper bag with Jackson's name on it. Inside the bag were clothing and 139 handwritten letters from Roberts to Jackson dated from October through early December 2001. Roberts told police that she had written the letters. Also in the trunk, police found an empty handcuffs box.

{¶ 19} During the ensuing investigation, police learned that Jackson and Roberts had spent a night at the Wagon Wheel Motel and that Roberts had registered for a room (room No. 129) at the Days Inn and had paid for a week. Police and a BCI agent found bloodstains in room No. 129. Police also recovered a garbage bag that had been in room No. 129 containing a nearly empty bottle of hydrogen peroxide and bloodstained bandages and gauze. The DNA of the blood was later determined to be consistent with Jackson's DNA profile. Fingerprints lifted from inside room No. 129 and from a Days Inn room-key envelope marked "129," which was also found in the garbage bag, matched Jackson's fingerprints.

{¶ 20} Police also learned that Fingerhut had two life-insurance policies naming Roberts as sole beneficiary. The aggregate benefit from the two policies was $550,000.

{¶ 21} Police discovered Fingerhut's car abandoned on the east side of Youngstown. A BCI forensic scientist found blood on the driver's visor and elsewhere inside the car. The blood on the visor was a mixture consistent with both Jackson's and Fingerhut's DNA profiles. Blood recovered from the trunk-release lever inside the car was a mixture with a major profile consistent with Jackson's DNA and a minor profile consistent with Fingerhut's DNA. The occurrence frequency of the DNA profile from blood found on the trunk-release lever is one in 45 quintillion, 170 quadrillion in the Caucasian population, one in 29 quadrillion, 860 trillion in the African–American population, and ·one in 22 quintillion, 400 quadrillion in the Hispanic population.

{¶ 22} Passages from the letters exchanged between Jackson and Roberts, as well as recorded phone calls Jackson made to Roberts from prison, revealed a plot to murder Robert Fingerhut. The subject was raised on more than one occasion.

{¶ 23} For example, on October 2, 2001, Jackson wrote to Roberts: "[W]hy don't you leave Robert an lets carry on with a world of our own? Or let me do what I was gonna do to him, because you know that—that was our little thing so you better not go an try to get know one else to do it, because I told you its getting done when I come home."

{¶ 24} On October 8, 2001, Jackson wrote: "Donna I got it already planned out on how we are gonna take care of the Robert situation. An baby its the best plan ever! Because Donna its now time that we really be together so that we can really see the true side of our love because I'm tired of not being able to be with you * * *."

{¶ 25} In an October 20, 2001 letter, Jackson wrote: "An Donna I don't care what you say but Robert has to go! An I'm not gonna let you stop me this time. An Donna you know that I've always wanted to live my life with you an only you but everytime that I wanted to take care of the situation by myself you wouldn't never let me. * * * Because you wouldn't let me do what I wanted to do to make you happy an that was get rid of him! So Donna can I do this so that we can go on an live happy? An then maybe we can sell the house an move on to somewhere else in our own world. An I'm not gonna be happy until that happens!"

{¶ 26} On October 26, 2001, Jackson wrote: "An then after that you don't ever have to worry about making know more excuses to him, because he will no longer be with us after 12–10–01 an then it'll be me an you totally an completely * * *." Within that same passage, Jackson drew a tombstone with the inscription "Rest

In Piss." Later in the same letter, Jackson wrote: "Hey Donna just think come 12–11–01 you'll be waking up to me or maybe we'll give it a couple of days to let things look cool an then after the funeral baby when I come home I'm never leaving an we're only doing it like that just to make it look good * * *. Alls I need is for my baby not to worry an leave everything else up to me."

{¶ 27} On October 29, 2001, Jackson wrote: "An as far as the Robert problem? Yes I'm taking care of that the next night, because I told you I'm tired of living like this when I don't have to. An after that will you get me a 2002 Cadillac Deville?" Later in the same letter, Jackson wrote: "An even if I gotta come to the house and shoot Robert in his fucking head you're gonna be with me."

{¶ 28} On October 30, Jackson wrote: "Well I see now you know that I'm about my business when I get out as far as our little situation? An get me a size large leather gloves an see if you can find me a ski mask hat okay? An I need them handcuffs you have an its mandatory, so get them for me, because the way that I'm gonna do it is gonna be right okay?"

{¶ 29} In recorded phone conversations between Jackson and Roberts during November 2001, the two continued to discuss Jackson's plans for Fingerhut. In a November 8, 2001 conversation, Jackson told Roberts that he wanted Fingerhut to see her perform fellatio on him before Fingerhut "goes away man." In their conversation on November 22, Roberts expressed worries that Jackson would get caught:

{¶ 30} "[Jackson]: * * * You know what I'm saying, the next day after. You know what I told you I wanted to do right?

{¶ 31} "[Roberts]: I'm afraid Nate.

{¶ 32} "[Jackson]: What you, man.

{¶ 33} "[Roberts]: I can't afford to lose you.

{¶ 34} "[Jackson]: And I, listen, listen here.

{¶ 35} "[Roberts]: I can not lose you. Like I will kill myself.

{¶ 36} "[Jackson]: Man, look. See man.

{¶ 37} "[Roberts]: If you go away from me again.

{¶ 38} "[Jackson]: Just forget about it man, * * * when a person, man, know what he's doing, man, * * * that's like jinxing, man. * * *.

{¶ 39} "[Roberts]: But what was the story with the trunk and handcuffs, that's too involved.

{¶ 40} "[Jackson]: Just, just, just leave it alone, alright.

{¶ 41} "[Roberts]: It's too much involved. Your gonna leave hair, your gonna leave prints, your gonna,

{¶ 42} "[Jackson]: Leave it alone, man.  Leave it alone, alright.

{¶ 43} " * * *

{¶ 44} "[Jackson]: Come on man.  This ain't Perry Mason man.

{¶ 45} "[Roberts]: I don't want to know anything about it ever."

{¶ 46} Two days later, on November 24, Jackson tried to reassure Roberts about his plan:

{¶ 47} "[Jackson]: Man, * * * we gonna really talk when I come home, ok.

{¶ 48} "[Roberts]: Ok.

{¶ 49} "[Jackson]: Especially about our, that situation, man.  You know.

{¶ 50} "[Roberts]: Yeah.

{¶ 51} "[Jackson]: I mean, it just, you know, you get too nervous at times, that's all the deal is.

{¶ 52} "[Roberts]: Yeah I know, it part of my nature.

{¶ 53} "[Jackson]: And then you said DNA, the only way they can do a DNA is if they got the other, the person's, you know what I'm saying.  If they got the person and the hair cause they can't just take no hair and say this is such and such hair.  * * * [T]he laws that we got in the State of Ohio and the laws from everywhere else, you know what I'm saying, I mean they way different.  * * *.

{¶ 54} "[Roberts]: Really.

{¶ 55} "[Jackson]: Hell yeah.  We'll, we'll talk about it when I come home Donna.  Ok, I don't want to talk about it over the phone."

{¶ 56} On December 8, the day before Jackson was released from prison, Jackson and Roberts had one final recorded conversation.  Roberts expressed misgivings about what Jackson was planning to do to Fingerhut, but Jackson told her, "I got to do this Donna.  I got to."  Roberts told Jackson that she did not want to know about it, and then the following colloquy took place:

{¶ 57} "N. Jackson: Just consider it a done deal.  Only thing I'm gonna need is one thing.

{¶ 58} "D. Roberts: What?

{¶ 59} " * * *

{¶ 60} "N. Jackson: I just need to be in that house when he come home.

{¶ 61} "D. Roberts: Oh no.

{¶ 62} " * * *

{¶ 63} "N. Jackson: Baby it ain't gonna happen in the house.  It ain't gonna happen in the house man, I promise you.

{¶ 64} " * * *

{¶ 65} "N. Jackson: I just need to be in there man. It ain't gonna happen in the house man. I mean I ain't gonna jeopardize that man.

{¶ 66} "D. Roberts: Well, let's not talk about it now.

{¶ 67} "N. Jackson: Ok. We'll talk, we'll, I'll just wait until tomorrow."

{¶ 68} Police arrested Roberts at her home on the night of December 20, 2001. Shortly afterwards, police arrested Jackson at the Youngstown home of Sheila Fields, Jackson's friend. Jackson surrendered without incident, and police noticed that he had a bandage on his left index finger. Police searched the home, with Fields's consent, and seized a pair of tennis shoes and a pair of black leather gloves. The index finger of the left glove appeared to have been torn off, and there was a red substance on what remained of that finger. The tread pattern of the shoes was consistent with the print left in blood near Fingerhut's body.

{¶ 69} Police brought Jackson to the Trumbull County Sheriff's Office around 2:00 a.m. on December 21, 2001, and advised him of his *Miranda* rights. Jackson initialed and signed the waiver-of-rights form. Jackson told Detectives Monroe and Hoolihan, "I just didn't mean to do it, man." Jackson then related on videotape his version of what happened, essentially claiming that he had shot Fingerhut in self-defense.

{¶ 70} Jackson's story was that he approached Fingerhut at the Youngstown bus terminal about getting a job and Fingerhut told him to meet him outside a restaurant later that evening. Jackson claimed to have known Fingerhut for a couple of years. Jackson claimed to have sold Fingerhut "some weed" when Fingerhut picked him up at the restaurant. Once inside Fingerhut's car, the two discussed a job at the bus terminal. Jackson asked whether he could stay at Fingerhut's house for the night and then get an early start on learning the job at the terminal the next day. Fingerhut agreed and took Jackson to his home, which Jackson acknowledged having visited before.

{¶ 71} Inside the home, Jackson claimed, Fingerhut started "disrespecting" him, and the two argued. Jackson said that Fingerhut then pointed a gun at him and shot him in the finger as Jackson tried to disarm him. Jackson claimed that he and Fingerhut had struggled over the gun and then Jackson got control of it and shot Fingerhut a couple of times. Jackson then grabbed car keys off the kitchen counter and fled in Fingerhut's car.

{¶ 72} Jackson asserted that he had been scared and had not meant to kill Fingerhut. He threw the gun from the car window while driving on the freeway back to Youngstown. He then called Roberts on the cell phone in Fingerhut's car and asked her to pick him up at Sheila Fields's house and get him a room at Days Inn. Jackson said he did not tell Roberts what had happened with Fingerhut and claimed, "Donna ain't had nothing to do with it at all, man."

{¶ 73} On December 28, 2001, a grand jury indicted Jackson on two counts of aggravated murder for killing Robert Fingerhut in violation of R.C. 2903.01(A) and (B). Both murder counts carried two felony-murder death-penalty specifications: murder during an aggravated burglary and during an aggravated robbery. R.C. 2929.04(A)(7). The grand jury also indicted Jackson on separate counts of aggravated burglary and aggravated robbery with a firearm specification on each count.

{¶ 74} Before a jury, the state presented numerous witnesses establishing the facts already mentioned. The defense presented three witnesses, whose testimony revealed that ownership documents for most of the property shared by Roberts and Fingerhut named Roberts as the owner. This evidence was intended to undermine the financial motive for the killing asserted by the state.

{¶ 75} The jury found Jackson guilty as charged.

{¶ 76} At the conclusion of the penalty phase of the trial, the jury recommended death, and the court imposed the death sentence on Jackson.

{¶ 77} Jackson has raised 12 propositions of law. We have reviewed each and have determined that none justifies reversal of Jackson's conviction for aggravated murder. Pursuant to R.C. 2929.05(A), we have also independently weighed the aggravating circumstances against the mitigating factors. We find that the aggravating circumstances outweigh any mitigation beyond a reasonable doubt. Therefore, we affirm Jackson's sentence of death.

## PRETRIAL ISSUES

### Suppression Issues

{¶ 78} In proposition of law I, Jackson argues that the trial court abused its discretion in overruling the motion to suppress his pretrial statement to police. Jackson contended at the suppression hearing that he repeatedly requested counsel but that police ignored his requests. He also claims that he told detectives that he did not want to answer any more questions but that the detectives continued to interrogate him.

{¶ 79} At the suppression hearing, Warren Police Detective Jeff Hoolihan testified that he arrested Jackson the night of December 20, 2001, and told him he was under arrest for aggravated murder. Hoolihan advised Jackson of his *Miranda* rights on the ride to the Trumbull County Jail. According to Hoolihan, without being questioned, Jackson denied killing anybody and asked whether he had the right to an attorney at any time. Hoolihan replied that he did. Jackson then told Hoolihan that he was on the phone with Roberts when he saw that police were surrounding the home where he was arrested. Hoolihan then told Jackson that Roberts had "snitched him out" and that he would have a chance to tell his side of the story when they arrived at the county jail.

{¶ 80} Jackson was taken to the jail, where he waited with Howland Township Police Sgt. Dillon and a corrections officer for approximately an hour until Captain Bacon arrived to open the interview room. Jackson was not questioned before Captain Bacon arrived. At approximately 1:45 a.m. on December 21, 2001, he was taken to the interview room, where Hoolihan and Howland Township Police Detective Paul Monroe questioned him. Jackson was given coffee and cigarettes and was very polite, cooperative, and alert. Jackson claimed that Fingerhut shot him in the finger and that he then wrested the gun from Fingerhut and shot him. Jackson agreed to allow police to videotape his statement. According to Hoolihan, Jackson did not ask for a lawyer or decline to answer questions.

{¶ 81} At 2:13 a.m., police began videotaping the interview and again informed Jackson of his *Miranda* rights and gave him a waiver-of-rights form, which he initialed and signed, thereby waiving his *Miranda* rights. The interview lasted approximately an hour. Jackson claimed that he did not mean to kill Fingerhut and essentially claimed that he had acted in self-defense.

{¶ 82} At the suppression hearing, Jackson testified that during the interview, he had asked to speak to an attorney. Jackson testified, "I didn't want to speak to them unless I had an attorney around." Jackson claimed that the police persisted in questioning him, even though he asserted, several times, his rights to say nothing more and to have an attorney present. Jackson also asserted that he had been high on painkillers and marijuana at the time. Although Jackson admitted signing the waiver, he claimed that no one had read him his rights beforehand.

{¶ 83} The trial court overruled the motion to suppress Jackson's confession after according no weight to Jackson's testimony. Instead, the trial court found Det. Hoolihan's testimony to be more persuasive. The court concluded that Jackson had been sufficiently advised of his *Miranda* rights and had voluntarily waived those rights. The court also found that Jackson had not unambiguously or unequivocally requested counsel before or during questioning. "At a suppression hearing, the evaluation of evidence and the credibility of witnesses are issues for the trier of fact." *State v. Mills* (1992), 62 Ohio St.3d 357, 366, 582 N.E.2d 972.

{¶ 84} During the videotaped statement, Jackson recounted his version of his interaction with Fingerhut before the shooting, described shooting Fingerhut in self-defense, and explained meeting with Roberts after the shooting. The detectives then asked Jackson how he was able to treat the wound to his finger. Jackson now asserts that at that point in the questioning, he requested counsel. He claims that the request is clear from the following portion of the transcript of the interview:

{¶ 85} "Det Hoolihan: Okay, but then she goes to Walgreens and brings the stuff to the room?

{¶ 86} "Jackson: (Mumbles) I, you know, I, I, I told you, you know what I'm saying, but what I had to say, man, I mean, I mean, I can't just sit here, you know what I'm saying, I mean, just, keep on, you know what I'm saying, back-tracking, I mean, I don't even want to talk about it no more, man. I'm, I'm, I'm through with it, man, just, man, you know what I mean, police, you know, I mean, I, I talked to a lawyer or something, man, you know what I mean, 'cause I, I mean, I ain't got time to just, just keep on, over and over, man, I'm, I'm through, man, I'm through, man, you know what I'm saying. I say, I mean, I, I ain't mean to do it, I'm sorry I did it, you know what I'm saying, I mean, but, I was left, I had no choice, man. And that's it. End of discussion, man.

{¶ 87} "Det Monroe: Anything else you want to say?

{¶ 88} "Jackson: (Inaudible) all I got to say, man, I didn't mean to do it, man. I mean, I mean, I'm sorry it happened.

{¶ 89} " * * *

{¶ 90} "Det Monroe: Well, there's, there's more here that we didn't get to.

{¶ 91} "Jackson: We, we just sum it up like I said, man, when, when I talk to my lawyer, man, you know what I'm saying. Other than that, man, you know, I mean."

{¶ 92} The interrogation continued a little longer and then stopped at 3:15 a.m., when Jackson said: "I have to go lay down, I don't want to, but shit, I got to, you know."

{¶ 93} Under the Fifth Amendment, an accused must clearly invoke his constitutional right to counsel in order to raise a claim of deprivation of counsel. "[T]he suspect must unambiguously request counsel. * * * [H]e must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, *Edwards* [*v. Arizona* (1981), 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378] does not require that the officers stop questioning the subject." *Davis v. United States* (1994), 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362.

{¶ 94} Here, we find that Jackson's alleged request for counsel was neither clear nor unambiguous. In *State v. Henness* (1997), 79 Ohio St.3d 53, 62–63, 679 N.E.2d 686, we held that "I think I need a lawyer" is not an unequivocal assertion of the right to counsel. In *State v. Brown,* 100 Ohio St.3d 51, 2003-Ohio-5059, 796 N.E.2d 506, ¶ 19, we held that "don't I supposed to have a lawyer present" was "at best ambiguous." Other courts have found similar remarks to be ambiguous and thus not invoking the constitutional right to counsel. See, e.g., *Mueller v.*

*Angelone* (C.A.4, 1999), 181 F.3d 557, 573–574 (defendant's question to police, "do you think I need an attorney here" answered by headshaking, a shrug, and the statement "You're just talking to us," was not an unequivocal request); *Dormire v. Wilkinson* (C.A.8, 2001) 249 F.3d 801 ("Could I call my lawyer?" followed by police response of "yes" did not invoke the right to counsel); *United States v. Zamora* (C.A.10, 2000), 222 F.3d 756, 766 ("I might want to talk to an attorney" was not "an unequivocal request for counsel").

{¶ 95} Because Jackson's words "I talked to a lawyer or something" or "when I talk to my lawyer" did not amount to a clear, unambiguous, or unequivocal invocation of the right to counsel, the trial court did not abuse its discretion in overruling his motion to suppress.

{¶ 96} Nor did Jackson unequivocally assert his right to remain silent during questioning by the police detectives. In *Michigan v. Mosley* (1975), 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313, the United States Supreme Court held that once a suspect invokes the right to remain silent, police must cease questioning him. However, similar to the invocation of the right to counsel, invocation of the right to stop questioning must be honored by police only if it is unambiguous. *State v. Murphy* (2001), 91 Ohio St.3d 516, 520, 747 N.E.2d 765, citing *Davis v. United States*, 512 U.S. at 461–462, 114 S.Ct. 2350, 129 L.Ed.2d 362. In *Murphy*, we held that the statement "I'm ready to quit talking now and I'm ready to go home, too" was ambiguous and not a clear invocation of the right to remain silent. Id. at 519, 521, 747 N.E.2d 765.

{¶ 97} Here, Jackson initially told the detective at the beginning of the videotaped interview, "I don't even like talking about it man * * * cause you know what I mean, it's fucked for me, man, * * * I told you * * * what happened, man, * * * I mean, I don't even want to, you know what I'm saying, discuss no more about it, man, you know, 'cause it ain't gonna, you know, it ain't gonna to bring, ain't gonna bring the man back."

{¶ 98} Later, in the colloquy set forth above during which Jackson alleges that he invoked his right to counsel, he stated: "I don't even want to talk about it no more, man. I'm, I'm, I'm through with it, man," and then a few phrases later says: "And that's it. End of discussion, man." Those statements alone might suggest that Jackson invoked his right to remain silent; but between those statements Jackson said, "I ain't mean to do it, I'm sorry I did it, * * * but, I was left, I had no choice, man." Given his equivocation, it is unclear whether Jackson wanted to end the discussion by invoking his right to remain silent.

{¶ 99} Although the police should have stopped their questioning once Jackson asserted, "And that's it. End of discussion," the statements Jackson made after this assertion did not add anything of any consequence or implicate him further.

We find that the admission of the subsequent statements by Jackson was harmless error.

{¶ 100} Thus, the trial court's finding that Jackson was properly advised of his *Miranda* rights and that he waived those rights is amply supported in the record. Jackson neither unequivocally nor unambiguously asserted his right to counsel. Any infringement of his right to remain silent during his custodial interrogation was nonprejudicial. Accordingly, we overrule proposition I.

## TRIAL ISSUES

### *Judicial Errors*

{¶ 101} In proposition of law IV, Jackson asserts that four instances of error committed by the trial court denied him due process and a fair trial.

{¶ 102} Two incidents cited by Jackson occurred during guilt-phase closing argument. First, Jackson complains that the prosecutor improperly accused defense counsel of creating a diversion, thereby implying that the defense was somehow lying or committing a fraud upon the court and jury. After an in-chambers conference regarding Jackson's objection to the prosecutor's characterization, the trial court failed to rule on the objection or issue a curative instruction.

{¶ 103} However, after the defense objected, the trial court told the jury: "Please disregard this little exchange. It's not part of this case." Even if the prosecutor's diversion comment were improper, Jackson must also show he was prejudiced. "Not every intemperate remark by counsel can be a basis for reversal." *State v. Landrum* (1990), 53 Ohio St.3d 107, 112, 559 N.E.2d 710. Defense counsel directly rebutted the prosecution's diversion accusation by stating during closing argument: "When he says * * * the defense is going to give you a diversion, he wants you to believe that I'm going to trick you somehow, okay. Well, I'm not going to trick you. You're smarter than that * * *." In our view, the trial court's failure to directly rule on the defense objection did not materially prejudice Jackson.

{¶ 104} Second, Jackson argues that the trial court improperly allowed the prosecutor to theorize about the evidence. The prosecutor stated during closing argument that Donna Roberts "depended on Robert [Fingerhut] and she was not in a position to financially take on the relationship [with Jackson] and have the way of life she had been used to with this guy." The defense objection was overruled.

{¶ 105} Nevertheless, "[t]he prosecution is entitled to a certain degree of latitude in summation." *State v. Treesh* (2001), 90 Ohio St.3d 460, 466, 739 N.E.2d 749. Several witnesses testified to the upper-middle-class lifestyle Roberts and Fingerhut enjoyed. In a letter to Jackson, Roberts complained that

Fingerhut had begun restricting her spending and that she was not used to living that way. She wrote, "I am used to having plenty of cash for whatever I want and buying everything I want." The prosecutor's comments were fair inferences based on this evidence. See, e.g., *State v. Myers*, 97 Ohio St.3d 335, 2002-Ohio-6658, 780 N.E.2d 186, ¶ 144. The trial court did not err in overruling defendant's objection, and Jackson does not demonstrate how he was prejudiced by the remarks.

{¶ 106} The third instance cited by Jackson took place during penalty-phase closing argument. Jackson complains that the prosecutor commented on the absence of a mitigating factor not raised by Jackson. Specifically, the prosecutor stated: "This lady [Jackson's expert psychologist] testified that there was no mental disease or defect, that mitigating factor does not exist in this case." Jackson's objection was essentially overruled by the trial court after a sidebar conference.

{¶ 107} The court erred here in permitting the prosecutor to argue the absence of a mitigating factor not raised by Jackson. Prosecutorial comment is appropriate only with regard to those factors actually offered in mitigation by defendant. *State v. DePew* (1988), 38 Ohio St.3d 275, 289, 528 N.E.2d 542; *State v. Mills* (1992), 62 Ohio St.3d 357, 373, 582 N.E.2d 972.

{¶ 108} The state contends that the defense opened the door to the issue when the defense expert testified that Jackson had once tested at a 70 IQ. Although the prosecutor was entitled to minimize that evidence by emphasizing Jackson's mental abilities, it was misconduct to cast his comments explicitly in terms of the absence of a statutory mitigating factor. Nevertheless, we find that the prosecutor's comment was harmless error, given the overwhelming weight of the aggravating circumstances over the mitigating factors. See *State v. Dixon*, 101 Ohio St.3d 328, 2004-Ohio-1585, 805 N.E.2d 1042, ¶ 90.

{¶ 109} Jackson also claims that error occurred during the testimony of prosecution witness Frank Reynolds, Fingerhut's former employee. Reynolds recalled overhearing a conversation between Fingerhut and Roberts the day before the murder. According to Reynolds, Roberts asked Fingerhut for $3,000, and when Fingerhut refused, she gave Fingerhut "the dirtiest look like it can kill a person."

{¶ 110} The defense objected on hearsay grounds. The trial court correctly overruled the defense objections. Roberts's request for money was not a statement as defined in Evid.R. 801(A), and thus Reynolds's testimony was not hearsay. *State v. Carter* (1995), 72 Ohio St.3d 545, 651 N.E.2d 965, paragraph two of the syllabus. Fingerhut's response was not offered for the truth of the matter asserted.

{¶ 111} Last, Jackson claims that cumulative errors by the trial court denied him a fair trial. We disagree. Jackson received a fair trial. Accordingly, we overrule proposition IV.

## Jury Instructions

{¶ 112} In propositions of law V and VI, Jackson argues that he was prejudiced by the trial court's jury instructions on purpose and reasonable doubt.

{¶ 113} In proposition V, Jackson contends that the trial court's instruction on purpose relieved the state of its burden of proof on the mens rea element of a capital crime. He further asserts that the purpose instruction created a mandatory, rebuttable presumption of the mens rea element from the mere use of a deadly weapon.

{¶ 114} But Jackson's failure to object to the purpose instruction waived all but plain error. *State v. Underwood* (1983), 3 Ohio St.3d 12, 13–14, 3 OBR 360, 444 N.E.2d 1332. This court has repeatedly rejected similar arguments. The trial court's instructions on mens rea, purpose, and causation were similar to the instructions this court upheld in, e.g., *State v. Loza* (1994), 71 Ohio St.3d 61, 80–81, 641 N.E.2d 1082; and *State v. Taylor*, 98 Ohio St.3d 27, 2002-Ohio-7017, 781 N.E.2d 72, ¶ 71–75. The instructions were therefore not plain error.

{¶ 115} In addition, Jackson's reliance on *State v. Wilson* (1996), 74 Ohio St.3d 381, 393, 659 N.E.2d 292, is misplaced. The instruction criticized there appears nowhere in any of the trial court's jury instructions on purpose.

{¶ 116} In proposition VI, Jackson complains that the trial court's reasonable-doubt instructions in both phases of the trial based on the language of R.C. 2901.05(D) were erroneous. Jackson's failure to object to either reasonable-doubt instruction waived all but plain error. *State v. Underwood*, 3 Ohio St.3d at 13–14, 3 OBR 360, 444 N.E.2d 1332. This court has repeatedly upheld use of reasonable-doubt instructions based on the statutory language. E.g., *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph eight of the syllabus; *State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, ¶ 65, 173. Accordingly, proposition VI is overruled.

## SENTENCING ISSUES

### Sentencing Opinion

{¶ 117} In proposition of law VII, Jackson argues that the trial court, in its sentencing opinion, improperly weighed both R.C. 2929.04(A)(7) alternatives contrary to *State v. Penix* (1987), 32 Ohio St.3d 369, 513 N.E.2d 744, and in effect required mitigation to be justification.

{¶ 118} In contending that the trial court weighed both R.C. 2929.04(A)(7) alternatives (principal offender, prior calculation and design), Jackson points to the following passages in the court's sentencing opinion:

{¶ 119} "The evidence reveals that the sole purpose for the Defendant's illegal entry in the Fingerhut residence was not to commit a theft, a kidnapping or a rape, but to [sic] rather to carry out the premeditated, cold blooded execution [of] Robert S. Fingerhut. This is the most heinous form of Aggravated Burglary, and it is entitled to unsurpassed weight. * * *

{¶ 120} " * * *

{¶ 121} " * * * From the overwhelming evidence, it is this Court's opinion that the Defendant and the Co–Defendant plotted the murder of Robert S. Fingerhut solely to collect $550,00[0].00 in insurance proceeds. This was accomplished by trespassing in the residence where Fingerhut resided, for the sole purpose of ambushing and murdering him."

{¶ 122} Jackson's arguments are not well taken. The jury found Jackson guilty of aggravated murder with prior calculation and design in count one. In count two, the jury found Jackson guilty of aggravated murder while committing aggravated burglary and aggravated robbery. The jury also found Jackson guilty of the two specifications attached to each count, and the (A)(7) alternatives were listed in the disjunctive.

{¶ 123} In its sentencing opinion, the trial court noted that the two counts had merged for sentencing purposes and that the state had elected to dismiss count two. The trial court, however, did not err in its opinion by referring to the murder as "premeditated" and "plotted," because the jury found in count one that Jackson murdered Fingerhut with prior calculation and design. Additionally, in its review of the jury's verdict on the specifications attached to the aggravated-murder counts, the trial court referred to the defendant as the principal offender and made no mention of "prior calculation and design." Although the trial court's commentary on the aggravated-burglary charge gives the appearance that it improperly weighed both R.C. 2929.04(A)(7) factors, in our independent review, we find that the trial court's ultimate decision was correct.

{¶ 124} In this case, the evidence clearly established that Jackson was the actual killer of Fingerhut. See State v. Yarbrough, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 168. Jackson admitted that he had killed Fingerhut, although he claimed self-defense. There is no merit to Jackson's contention that the trial court equated "mitigation" with "justification" in its sentencing opinion. Nothing in the sentencing opinion states this. The trial court specifically defined mitigating factors to the jury as "factors that while they do not justify or excuse the crimes of aggravated murder * * * shall be considered by you as extenuating lessening, weakening, excusing to some extent or reducing the degree of sen-

tence." Thus, the trial court clearly understood that mitigating factors "do not justify or excuse" the offense.

### Appropriateness of the Sentence

{¶ 125} In proposition of law VIII, Jackson contends that his death sentence is inappropriate and disproportionate to the penalty imposed in similar cases. Jackson's arguments will be considered as part of our independent review of sentence.

### Proportionality Review

{¶ 126} In propositions of law IX and X, Jackson asserts that proportionality review in Ohio is fatally flawed under R.C. 2929.05 because only cases in which the death penalty has been imposed are used for comparison. Neither proposition has merit. Proportionality review needs to entail only those cases in which the death sentence has been imposed. *State v. Steffen* (1987), 31 Ohio St.3d 111, 123–124, 31 OBR 273, 509 N.E.2d 383; *State v. Jordan*, 101 Ohio St.3d 216, 2004-Ohio-783, 804 N.E.2d 1, ¶ 86.

## EFFECTIVE ASSISTANCE OF COUNSEL

{¶ 127} In proposition of law II, Jackson asserts that trial counsel rendered ineffective assistance. Reversal of a conviction for ineffective assistance requires two showings. "First, the defendant must show that counsel's performance was deficient. Second, the defendant must show that the deficient performance prejudiced the defense. Proving prejudice requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial." *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. Accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373. In no instance, however, does Jackson demonstrate prejudice, "a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." Id. at paragraph three of the syllabus.

{¶ 128} *Voir Dire.* Jackson first argues that defense counsel failed to object to what he characterizes as the prosecutor's "extraction of guilty verdict and death verdict promises from all twelve impaneled" jurors during voir dire, relying on *State v. Treesh* (2001), 90 Ohio St.3d 460, 465, 739 N.E.2d 749. Yet " '[t]he failure to object to error, alone, is not enough to sustain a claim of ineffective assistance of counsel.' " *State v. Fears* (1999), 86 Ohio St.3d 329, 347, 715 N.E.2d 136, quoting *State v. Holloway* (1988), 38 Ohio St.3d 239, 244, 527 N.E.2d 831. This court will normally defer to defense counsel's judgment in voir dire and not find ineffective assistance. See *State v. Clayton* (1980), 62 Ohio St.2d 45, 49, 16 O.O.3d 35, 402 N.E.2d 1189. Like the prosecutor in *Treesh*, the prosecutor here asked potential jurors whether they would return a guilty verdict if the state

proved guilt beyond a reasonable doubt. There is nothing wrong with such questions, and *Treesh* does not hold otherwise.

{¶ 129} All of the jurors Jackson mentions indicated that they could return either a death sentence or life sentence depending on whether the state proved its case beyond a reasonable doubt based on evidence presented at trial. Accordingly, we reject Jackson's claim of ineffective assistance in this regard.

{¶ 130} Next, Jackson contends that counsel were ineffective by failing to object during voir dire to the prosecutor's use of only mental disease and age as examples of mitigating factors. Jackson asserts that in limiting examples to these two, the prosecution predisposed most jurors who sat on the case to expect those mitigating factors during the penalty phase. Jackson relies on *State v. Jones* (2001), 91 Ohio St.3d 335, 338, 744 N.E.2d 1163, in which this court stated, "During voir dire, a trial court is under no obligation to discuss, or to permit the attorneys to discuss, specific mitigating factors." According to Jackson, *Jones* stands for the proposition that it is improper to ask prospective jurors to weigh or consider specific mitigating factors during voir dire.

{¶ 131} Jackson's counsel were not ineffective for failing to object. Jackson misconstrues the *Jones* holding. *Jones* reiterated the proposition that a trial court does not err or abuse its discretion in refusing to allow attorneys to ask prospective jurors about specific mitigating factors. See *State v. Wilson*, (1996), 74 Ohio St.3d 381, 386, 659 N.E.2d 292. *Jones*, however, does not prohibit attorneys from referring to specific mitigating factors as examples of mitigating evidence during voir dire questioning. A trial court does not abuse its discretion in allowing that type of question.

{¶ 132} Jackson also does not demonstrate how jurors were predisposed to expect mitigating factors that were not raised or did not apply. Whenever the prosecutor referred to specific mitigating factors during voir dire, he used them solely as a hypothetical and cautioned the individual prospective jurors that the factors being discussed did not necessarily apply to Jackson's case. Counsel's decision not to object to the prosecutor's use of specific mitigating factors in voir dire inquiries did not constitute deficient performance. Therefore, Jackson's arguments are not well taken.

{¶ 133} Jackson next argues that counsel were ineffective for not objecting to inappropriate statements and misconduct of the prosecutor that prejudiced and predisposed the jury to return guilty and death verdicts. Jackson cites six prosecutorial comments that he claims were inappropriate: (a) "The first trial deals with the state proving beyond a reasonable doubt, the Defendant committed aggravated murder"; (b) "if you found beyond a reasonable doubt even though there were mitigating factors, you would still, under the law, return a verdict recommending the death penalty, do you understand that?"; (c) "So we're dealing

with charges where the person committed the crime, the Defendant is alleged of killing a homeowner"; (d) "in this case the aggravating circumstances accuse the Defendant of purposely killing a homeowner in the commission of an aggravated burglary"; (e) "So that means that you would be able, if you were one of the 12 jurors, to listen to the evidence and decide the Defendant's guilt based only on the evidence, right?"; and (f) "In this case, the Defendant is charged with killing a home owner in an aggravated murder."

{¶ 134} None of the foregoing statements constituted prosecutorial misconduct, and counsel were not deficient in failing to object to any of them. Statement (a) is largely accurate, although a more complete statement would have referred to "the first trial" as the first phase or the guilt phase. Statement (b) was confusing and a misstatement because it was not limited to the situation in which the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt. R.C. 2929.03(D)(2). Nevertheless, soon after this misstatement, the prosecutor correctly stated the state's burden of proof in the penalty phase.

{¶ 135} Statements (c), (d), and (f) are inaccurate because Fingerhut was not a homeowner, and homeowner status is not an element of any crime or specification that Jackson was charged with committing. Jackson's claims of prejudice, however, are not persuasive. Statement (e) was not improper in the context of the voir dire questioning concerning pretrial publicity. The prosecutor followed up this alleged prejudicial statement with "And that is why we ask the question, because if you come into Court believing the Defendant was guilty from prior publicity, you wouldn't be fair, right?"

{¶ 136} *Guilt phase.* Jackson next contends that counsel were deficient in fashioning a defense based on the fact that Roberts owned the house and car and that she had given Jackson permission to enter, thus supposedly negating the burglary and robbery charges.

{¶ 137} Defense counsel unsuccessfully sought a jury instruction that would have provided that if the owner—i.e., Roberts—had given Jackson permission to enter the property or use the car, then there was no trespass. Jackson asserts that counsel were apparently unaware that such a defense to burglary and robbery was precluded, he claims, by decisions of this court. See *State v. Steffen*, 31 Ohio St.3d 111, 115, 31 OBR 273, 509 N.E.2d 383, and *State v. Rhodes* (1982), 2 Ohio St.3d 74, 2 OBR 629, 442 N.E.2d 1299.

{¶ 138} However, counsel's decisions in this area were trial strategy. This court ordinarily refrains from second-guessing strategic decisions counsel makes at trial, even when counsel's trial strategy was questionable. *State v. Clayton*, 62 Ohio St.2d at 49, 402 N.E.2d 1189. Given the abundant evidence of Jackson's guilt, counsel were left with few options in attempting to create reasonable doubt in the minds of the jury. Assuming that the jury could have found merit in the

defense claim that Jackson had killed Fingerhut in self-defense, the requested jury instruction would have been consistent with that defense. In any event, we find that counsel's pursuit of this strategy did not prejudice Jackson or affect the outcome of his trial.

{¶ 139} Jackson next asserts ineffective assistance in defense counsel's failure to object to admission of letters allegedly written by Roberts to Jackson without requiring authentication of her writings as a predicate to admission. In contrast, Jackson points out, his letters to Roberts were admitted only after authentication of his authorship was established by testimony of a handwriting expert.

{¶ 140} Detective Monroe did properly identify the letters pursuant to Evid.R. 901(A). Roberts told Monroe that she had written the letters. They were found in the trunk of Roberts's car in a bag with Jackson's name on it. They were signed "Donna Marie." They had a return address of a post office box registered to Roberts. Counsel were not ineffective in failing to object to the admission of Roberts's letters to Jackson, for they were properly authenticated, and defense counsel used them as part of their trial strategy to bolster Jackson's claim of self-defense.

{¶ 141} Finally, Jackson asserts that the cumulative effect of errors and omissions by trial counsel infringed his right to effective assistance of counsel. However, Jackson received a fair trial. Accordingly, proposition II is overruled.

## PROSECUTORIAL MISCONDUCT

{¶ 142} In proposition of law III, Jackson alleges ten instances of prosecutorial misconduct during trial. Whether improper remarks constitute prosecutorial misconduct requires analysis as to (1) whether the remarks were improper and, (2) if so, whether the remarks prejudicially affected the accused's substantial rights. *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883. The touchstone of analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78. This court will not deem a trial unfair if, in the context of the entire trial, it appears clear beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper comments. *State v. Treesh*, 90 Ohio St.3d at 464, 739 N.E.2d 749.

{¶ 143} *Voir Dire.* The first three instances cited by Jackson are the same as those he sets forth in proposition II, in which he claims that counsel were ineffective for failing to object. As was discussed under proposition II, we determine that the prosecutor did not improperly extract promises from prospective jurors to find guilt and vote for a death verdict. The prosecutor's questions during voir dire on life and death were not improper.

{¶ 144} Likewise, the prosecutor's use of two mitigating factors with prospective jurors to illustrate the weighing process was not improper. As we explained under proposition II, those examples were set forth as hypotheticals, and the trial court had discretion to allow them.

{¶ 145} In addition, as we noted under proposition II, none of the alleged misstatements constituted prosecutorial misconduct. Even the statements that were not accurate did not prejudice Jackson's substantial rights.

{¶ 146} *Guilt Phase.* In the fourth instance, Jackson complains that the prosecutor expanded his opening statement into argument at the beginning of the guilt phase. The prosecutor's opening statement was at times argumentative, and the prosecutor conceded at a sidebar conference that he should have prefaced his remarks by stating: "The evidence is gonna show * * * ." Defense counsel objected and moved for a mistrial. Although the trial court overruled the motion, it immediately gave the jury a curative instruction, stating: "[T]he purpose for opening statements is to present what either side expects to show. * * * It is not proper to get into the realm of opinion on the opening statement. * * * So you should listen to what the State expects to show and disregard anything else that may have been said that might delve into the realm of opinion at this point." Because we presume that the jury followed the court's instructions, *State v. Treesh,* 90 Ohio St.3d at 480, 739 N.E.2d 749, prejudice to Jackson is lacking.

{¶ 147} In the fifth instance, Jackson contends that the prosecutor improperly solicited repetitive hearsay from Detective Monroe. While on direct examination, Monroe sometimes responded beyond the scope of the prosecutor's questions. Defense counsel complained about this behavior in chambers and moved for a mistrial. The court overruled the motion but agreed that defense counsel's concern was legitimate because Monroe was answering beyond the scope of the questions. The prosecutor was instructed by the court to talk to Monroe and tell him to limit his answers. On his allegation of repetitive hearsay, Jackson does not provide specific instances. He also does not show how the prosecutor's direct examination of Monroe prejudiced his substantial rights.

{¶ 148} The sixth instance raised by Jackson is the prosecutor's characterization during guilt-phase closing argument of the defense's interpretation of evidence as a diversion. However, as we noted under proposition IV, even if it is assumed that the prosecutor's comment was improper, prejudice to Jackson is lacking. "Not every intemperate remark by counsel can be a basis for reversal." *State v. Landrum,* 53 Ohio St.3d at 112, 559 N.E.2d 710. Even without the prosecutor's remark, the jury would have found Jackson guilty, given the overwhelming evidence of guilt. See *State v. Maurer,* 15 Ohio St.3d at 267, 15 OBR 379, 473 N.E.2d 768.

{¶ 149} Jackson alleges in his seventh instance that the prosecutor argued facts not in evidence. He cites these comments of the prosecutor during the closing argument: "She [Donna Roberts] had the ability to walk out of the relationship with her significant other. There wasn't a marriage; there was a divorce. And she had legal title to cars, legal title to the home, she had everything. But we will go into when you read and listen to the evidence that she depended on Robert and she was not in a position to financially take on the relationship and have the way of life she had been used to with this guy." The defense's objection was overruled.

{¶ 150} As we noted under proposition IV, these comments were fair inferences that the jury could adopt based on the evidence and testimony. See, e.g., *State v. Myers,* 97 Ohio St.3d 335, 2002-Ohio-6658, 780 N.E.2d 186, ¶ 144.

{¶ 151} In the eighth instance, Jackson argues that the prosecutor improperly theorized about the evidence during rebuttal guilt-phase closing argument. The prosecutor stated:

{¶ 152} "What happened? Well, I don't know for certain, but I think what the evidence is going to disclose is here is what happened. This man and Donna Roberts plotted the murder and what their plan was was to go to the house and when Robert Fingerhut got home pull a gun on Robert Fingerhut, handcuff him and forcibly take him from the house at 254 Fonderlac, take him down to Youngstown and execute him in Youngstown and leave the car there. That was the plan."

{¶ 153} The defense's objection was overruled.

{¶ 154} Prosecutors are entitled to latitude as to what the evidence has shown and what inferences can be drawn from the evidence. *State v. Richey* (1992), 64 Ohio St.3d 353, 362, 595 N.E.2d 915, overruled on other grounds, *State v. McGuire* (1997), 80 Ohio St.3d 390, 402–404, 686 N.E.2d 1112. A prosecutor may state his or her opinion if it is based on the evidence presented at trial. See, e.g., *State v. Durr* (1991), 58 Ohio St.3d 86, 96, 568 N.E.2d 674.

{¶ 155} We find in Jackson's case that the prosecutor's theory was based on the evidence at trial. In his letter to Roberts dated October 30, 2001, Jackson asked Roberts to obtain for him leather gloves, a ski mask, and handcuffs. Detective Monroe found an empty handcuffs box in the trunk of Roberts's car shortly after the murder. In a recorded phone conversation the day before his release from prison, Jackson assures Roberts, "Baby it ain't gonna happen in the house. It ain't gonna happen in the house man, I promise you. * * * I just need to be in there man. It ain't gonna happen in the house man."

{¶ 156} In our view, the prosecutors' comments were fair inferences based on the evidence at trial and therefore were not improper. There is also no showing that the comments prejudiced Jackson's substantial rights.

{¶ 157} *Penalty Phase.* In Jackson's ninth alleged instance, the prosecutor improperly argued during penalty-phase closing argument that Jackson had no mental disease or defect, a mitigating factor not raised by the defense.

{¶ 158} As we discussed under proposition IV, the prosecutor erred in arguing the absence of a mitigating factor not raised by defendant. Prosecutorial comment is appropriate only about those factors actually offered in mitigation by defendant. See, e.g., *State v. Mills,* 62 Ohio St.3d at 373, 582 N.E.2d 972. Nevertheless, the comment was harmless error.

{¶ 159} Jackson claims in the tenth instance that the prosecutor improperly referred to the homicide as a "cold blooded psychopathic killing." The defense objected, and the trial court sustained the objection, instructing the jury to disregard the comment. In instructing in this way, the trial court ameliorated any error. See *State v. Wilson* (1972), 30 Ohio St.2d 199, 204, 59 O.O.2d 220, 283 N.E.2d 632.

{¶ 160} Last, Jackson's claim that the cumulative effect of misconduct by the prosecutor during both phases of trial deprived him of a fair trial lacks merit. We believe that Jackson received a fair trial, and any error was either harmless or curable by our independent review of his sentence. "Such errors cannot become prejudicial by sheer weight of numbers." *State v. Hill,* 75 Ohio St.3d at 212, 661 N.E.2d 1068. Furthermore, it is clear beyond a reasonable doubt that the jury would have found Jackson guilty even without the alleged improper comments. *State v. Treesh,* 90 Ohio St.3d at 464, 739 N.E.2d 749. Accordingly, proposition III is rejected.

## CONSTITUTIONALITY

{¶ 161} In propositions of law XI and XII, Jackson challenges Ohio's death-penalty statutes on numerous constitutional grounds and concedes that many of his constitutional claims have been rejected by this court in a number of cases. We summarily reject all of Jackson's constitutional claims. See, e.g., *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264; *State v. Buell* (1986), 22 Ohio St.3d 124, 22 OBR 203, 489 N.E.2d 795; *State v. McNeill* (1998), 83 Ohio St.3d 438, 700 N.E.2d 596; *State v. Bey* (1999), 85 Ohio St.3d 487, 502, 709 N.E.2d 484; *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus.

## INDEPENDENT REVIEW AND PROPORTIONALITY

### *Aggravating Circumstances*

{¶ 162} Upon our independent assessment, the evidence proves beyond a reasonable doubt the aggravating circumstances in this case: that Nathaniel

Jackson murdered Robert Fingerhut while committing aggravated burglary and aggravated robbery.

## Mitigating Evidence

{¶ 163} In the penalty phase, Jackson presented five witnesses and gave an unsworn statement.

{¶ 164} Raymond Dickerson, Jackson's stepfather, has known Jackson since Jackson was 15 years old. He testified that Jackson was respectful to him and to Jackson's mother and grandmother. Dickerson noted that he did not see much of Jackson after Jackson turned 17 years old.

{¶ 165} Taushia Korneagay, Jackson's sister, stated that Jackson was kind and treated her well and did a lot for her. Korneagay noted that Jackson helped her in many ways with her four children. She said that she wanted the jury to spare Jackson's life.

{¶ 166} Lorraine Rue, the mother of Jackson's daughter, Shaylese, and Shaylese herself, a second-grader, appeared on the witness stand together. Rue testified that Jackson had visited Shaylese in the past and had brought her toys.

{¶ 167} Pauline Korneagay, Jackson's mother, briefly described Jackson's upbringing and stated that Jackson did "pretty good" in school. She answered "no" when asked whether Jackson had grown up in a rough neighborhood. She did not remember Jackson's being shot while in school, or that she had written a letter to excuse him from school for that reason. Pauline said that she keeps in touch with Jackson.

{¶ 168} Dr. Sandra McPherson, a clinical and forensic psychologist, was the principal mitigation witness. Dr. McPherson interviewed Jackson, reviewed his school and other records, and submitted a report on her findings. She noted that Jackson's father had little, if any, involvement with his son and that Jackson grew up under the care of his mother and maternal grandmother. According to Dr. McPherson, Jackson exhibited serious behavioral problems from the first grade on, "which is fairly unusual." By third grade, Jackson had already been suspended from school because of his behavioral difficulties.

{¶ 169} Dr. McPherson observed that Jackson's school record reflected an attention-deficit hyperactivity disorder ("ADHD") characterized by impulsiveness and an inability to stop his behavior. Jackson was never put in any kind of structured program to deal with his ADHD until the eighth grade, the only time Jackson recalled liking school.

{¶ 170} Jackson began using alcohol and drugs early in life, but does not seem to have developed a primary alcohol dependency. He began using marijuana at around age 13 and quickly became dependent on it. He also used cocaine to

some degree. Jackson never used other serious drugs. Nevertheless, Dr. McPherson noted that Jackson's repeated involvement in crimes as an adult was mostly related to his drug habit.

{¶ 171} Dr. McPherson said that Jackson had worked very little in his life. His longest period of work was about six months, and he never worked fulltime. Jackson dropped out of school in the 11th grade and decided to live independently of his mother. His idea of independence was to live on the streets. Jackson has been shot at least four times. Even before he dropped out of school, Jackson had been a target of gunfire. Dr. McPherson testified that Jackson's school records indicate that his mother had once sent a note to school to excuse Jackson because he had been shot at and had to make a police report.

{¶ 172} Jackson has fathered two children, but has never been in a position to assume parental responsibilities. One of the children has cerebral palsy, and the mother's family does not allow Jackson any contact with the child.

{¶ 173} Dr. McPherson administered several tests to Jackson. Although Jackson's IQ had twice been tested at 70 in grade school, a more recent test put him at a full-scale IQ of 84. Dr. McPherson attributed the difference in scores to the fact that Jackson had not been motivated to cooperate when he took the test in school and that he did better under the more structured environment of prison. Taking into account Jackson's minimal education, Dr. McPherson believes him to be of average ability. She noted that Jackson possesses some artistic talent.

{¶ 174} Jackson suffers from an antisocial personality disorder, but has shown the capacity to be loyal to those within his own group. According to Dr. McPherson, Jackson displayed loyalty to Roberts and did not try to avoid responsibility and blame the murder on her. Dr. McPherson testified that Jackson does have the ability to get along with other people and has done well in the structured environment of prison. Dr. McPherson opined that as far as Jackson's future behavior was concerned, he would function best in a prison environment.

{¶ 175} Dr. McPherson described Jackson's relationship with Donna Roberts as "very destructive." She stated that Jackson is very insecure and received a certain amount of reassurance in his relationship with Roberts, which made him feel like somebody special. According to Dr. McPherson, Jackson felt that his life would be more stable with Roberts.

{¶ 176} Jackson gave an unsworn statement in which he stated: "I would like to apologize for what happened to the victim. I am very sorry for what happened and I know by me saying sorry ain't going to bring his life back. This is something I have to live with for the rest of my life, and also like for my daughter, to know that she still has a father that is alive and I would like to see her grow up."

*Sentence Evaluation*

{¶ 177} The nature and circumstances of the offense offer nothing in mitigation. Jackson, with the aid and support of Roberts, planned to murder Fingerhut to get him out of the way and reap the insurance proceeds Roberts would obtain from Fingerhut's death. In correspondence and phone conversations, Jackson assured Roberts that the murder was something he had to do and that he had it all figured out. Jackson murdered Fingerhut in his home and then fled the scene in Fingerhut's car. Jackson's self-defense claim lacks credibility in light of all the evidence.

{¶ 178} Jackson's history, character, and background offer some mitigating features. His father was never part of his life, and he suffered from behavioral problems in school, mostly because of his ADHD. Although Jackson's mother denied that Jackson had grown up in a rough neighborhood, the school records and evaluation by Dr. McPherson indicate otherwise. Jackson's drug dependency was fueled by his involvement in crime, which consisted mostly of burglaries.

{¶ 179} Jackson appears to have the love and support of his family. He indicated in his unsworn statement that he cares about his daughter. Dr. McPherson testified that despite his problems, Jackson has also displayed loyalty—sometimes, as in his relationship to Roberts, to his detriment.

{¶ 180} With respect to the statutory mitigating factors of R.C. 2929.04(B), none appear applicable except for "other mitigating factors" under (B)(7). Although Jackson claimed that Fingerhut pulled a gun on him, thus forcing him to kill Fingerhut in self-defense, the factor of victim-inducement under (B)(1) is not implicated because the claim of self-defense lacks any credibility under the evidence. Likewise, there is no credible evidence of the factor of victim provocation under (B)(2). Jackson's mitigation expert dispelled any claim that he suffers from a mental disease or defect, the factor under (B)(3). Since Jackson was 29 years old at the time of the homicide, the youthful-offender factor under (B)(4) does not apply. There is no mitigation in the factor of a clean record under (B)(5), for Jackson had a history of prior criminal convictions. Finally, since Jackson was the principal offender in the murder, the factor of being an accomplice rather than the principal offender under (B)(6) does not apply.

{¶ 181} Under R.C. 2929.04(B)(7), Jackson's ADHD and antisocial personality disorder deserve some weight in mitigation, as well as his ability to overcome his ADHD and adaption to the structured setting of prison. See *State v. Scott*, 101 Ohio St.3d 31, 2004-Ohio-10, 800 N.E.2d 1133, ¶ 106.

{¶ 182} On the other hand, Jackson's expression of remorse "for what happened to the victim" deserves little weight in mitigation. See *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 226.

{¶ 183} Upon independent weighing, we find that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt. Jackson murdered Fingerhut during a burglary and stole his car. These were the aggravating circumstances that merit imposition of the capital penalty. Those were weighed against the mitigating evidence found in the nature and circumstances of the offense, Jackson's history, character, and background, and the statutory factors of R.C. 2929.04(B). We find that the aggravating circumstances of this case outweigh the minimal mitigating factors.

{¶ 184} We further find that the death penalty is both appropriate and proportionate when compared with capital cases also involving aggravated murder during aggravated burglary, see *State v. Davie* (1997), 80 Ohio St.3d 311, 686 N.E.2d 245, and aggravated murder during aggravated robbery, see *State v. Burke* (1995), 73 Ohio St.3d 399, 653 N.E.2d 242; *State v. Raglin* (1998), 83 Ohio St.3d 253, 699 N.E.2d 482.

{¶ 185} We therefore affirm the convictions and sentences, including the death sentence.

Judgment affirmed.

MOYER, C.J., RESNICK, PFEIFER, LUNDBERG STRATTON, O'CONNOR and O'DONNELL, JJ., concur.

---

Dennis Watkins, Trumbull County Prosecuting Attorney, and LuWayne Annos, Assistant Prosecuting Attorney, for appellee.

John P. Laczko and Dennis Day Lager, for appellant.