OPINION
{¶ 1} Defendant-appellant, Antwan J. Hall, appeals his conviction and sentence in the Butler County Court of Common Pleas on charges of rape, aggravated robbery, kidnapping, and felonious assault.
 {¶ 2} On Sunday evening, January 23, 2005, Tina O. was at the bar she owns in Middletown, in Butler County, Ohio. The bar is closed on Sundays, but Tina was there that night with several of her friends, watching football, playing pool, and having a few cocktails.
 {¶ 3} Around midnight, Tina received a phone call from appellant. Appellant and Tina were acquainted with one another as Tina had bought cocaine from appellant on at least two occasions in the past. Appellant told Tina that he and his "auntie" were driving through Middletown, and asked Tina what she was doing. Tina invited appellant to come over and see her bar. At about 2:00 a.m. on the morning of January 24, 2005, appellant and Joyce Haynes, a woman whom appellant considers to be, and refers to as, his aunt, came into Tina's bar. After playing cards with Tina for about an hour, appellant left to take Haynes home. Tina remained at the bar, watching television in the backroom.
 {¶ 4} Thereafter, appellant called Tina to see if she was still awake and to ask if he could come back to the bar. After Tina replied, "I don't care," appellant returned to the bar at around 4:00 a.m. Upon his return, appellant and Tina sat on bar stools in the front of the bar, playing cards for about a half-hour. When appellant brought out some marijuana and suggested that they "smoke a joint," Tina told him he had to do that in the bar's backroom.
 {¶ 5} Appellant and Tina went to the backroom, where appellant rolled a marijuana cigarette and smoked it. Leaning back on a couch in the backroom, appellant told Tina how cute she was and how much he had always liked her. Tina sat on the couch and took a puff from appellant's marijuana cigarette. Appellant asked Tina several times to lean back on the couch, but after she repeatedly refused to do so, he punched her in the nose, causing her to bleed profusely. Appellant then removed Tina's pants, turned her around, and engaged in sexual intercourse with her from behind. At one point, appellant told Tina not to look at him because he did not want her to bleed on him.
 {¶ 6} When he had finished, appellant tied Tina's hands, and then went to the front of the bar to see if the door was locked. When he did so, Tina was able to untie her hands. When appellant returned to the backroom, Tina threw a ladder on top of him and tried to run out the front door, but she was unable to do so because the door was locked. Appellant dragged Tina back into the bar's backroom, telling her "you almost made it, didn't you."
 {¶ 7} When appellant attempted to tie Tina's hands again, she resisted because she was fearful as to what might happen to her if she was tied up. Appellant told Tina that he just wanted to leave, and did not want her to contact the police. Tina responded, "take my cell phone, take the bar phone, take anything. Don't tie me up." Appellant took Tina's cell phone. Tina tried to run away again, but appellant caught her, put his arm around her neck, and tried to suffocate her. He then threw her to the ground, banging her head on the concrete floor of the backroom, causing Tina to fracture her jaw and bones in her chin and cheek areas. Appellant then forced Tina to submit to sexual intercourse from behind again, on the concrete floor near a walk-in cooler.
 {¶ 8} Thereafter, appellant tied Tina's hands behind her back. Appellant made a phone call, telling an unidentified person, "I'm down at this girl's bar and she wouldn't give it to me so I took it from her * * * you need to come down here because if she tells on me I want you to take care of her." Appellant then asked Tina where her supply of Clorox was. At that point, a second person showed up, who Tina believed was a boy because of the sound of his voice. The second person tied Tina's feet. Appellant and the second person announced that they were leaving, and told Tina not to leave. Tina asked them for a blanket from the backroom's couch. They gave the blanket to her and then told her that they were leaving but would be coming back. Later, appellant and the second person did come back. Tina heard the second person ask, "Is she still breathing?" Then, appellant and the second person left again.
 {¶ 9} At approximately 10:00 a.m. that morning, two deliverymen from one of the bar's suppliers came to the bar and discovered that the front door was unlocked and the bar was in disarray, with bar stools overturned and broken beer bottles on the floor. The deliverymen called out, but upon hearing no answer they went to the backroom of the bar where they discovered Tina, wrapped in a blanket, bloody and beaten, and tied up with an extension cord.
 {¶ 10} The deliverymen called 911. Paramedics arrived and gave Tina medical attention. She was later taken to Middletown Regional Hospital for further examination and treatment. Approximately one week later, Tina was interviewed by Detectives Tim Riggs and David Swartzel, of the Middletown Police Department, concerning the attack on her. Tina initially police that she was attacked by two men, who were wearing masks, and that she did not know who had attacked her. However, after speaking with her family, Tina told Detectives Riggs and Swartzel two or three days later that it was appellant who had raped and beaten her, and tied her up. Tina told the detectives that she did not initially identify appellant as her assailant because appellant had told her that he would kill her if she did.
 {¶ 11} Thereafter, Middletown police obtained an arrest warrant for appellant. Both the Middletown and Dayton Police Departments attempted to locate appellant at his Dayton address. On February 20, 2005, Dayton police attempted to make a traffic stop of appellant. Appellant refused to stop and a chase ensued. Appellant eventually crashed into the gates of his apartment complex. When appellant bailed out of his car, the police began to chase him on foot. Appellant jumped over a six-foot high fence, and went into his apartment and locked the door. The police surrounded appellant's apartment and called in a SWAT team. After a six-hour standoff, the SWAT team was eventually able to negotiate appellant's surrender.
 {¶ 12} On March 3, 2005, appellant was taken to the Middletown police station where he was interviewed by Detective Riggs, after Riggs had informed appellant of his Miranda
rights. Appellant gave a tape-recorded statement, in which he stated that Tina called him on the night in question, asking him to sell her $100 worth of crack cocaine. He went to Tina's bar with his aunt, where Tina paid him $50 of the amount owed. The three of them played cards, and then he left "to make some more runs."
 {¶ 13} Appellant further stated that he later returned to the bar, but that Tina still did not have the remaining amount she owed him. Appellant rolled a "blunt," and then he and Tina engaged in consensual sexual intercourse on the couch in the bar's backroom. Afterwards, appellant and Tina got into an argument about the money she still owed him. Appellant swung at Tina, and she ran, still naked, for the door. Appellant pulled up his pants and ran after Tina. After catching her, the two argued and fought, again. Appellant stated that he "thunked" Tina and left. Appellant told the detectives that the last he saw of Tina, she was laying on the floor, and that he thought she was dead. He insisted that he did not tie up Tina, and did not know who did.
 {¶ 14} Appellant was later indicted on one count of aggravated robbery in violation of R.C. 2913.01, a felony of the first degree ("Count One"); two counts of rape in violation of R.C. 2907.02(A)(2), felonies of the first degree ("Counts Two and Three"); one count of kidnapping in violation of R.C.2905.01(A)(4), a felony of the first degree ("Count 4"); one count of kidnapping in violation of R.C. 2905.01(A)(2), a felony of the first degree ("Count 5"); and one count of felonious assault in violation of R.C. 2903.11(A)(1), a felony of the second degree ("Count 6"). Appellant pled not guilty to the charges.
 {¶ 15} Prior to his trial, appellant moved to have the statements he made to Detectives Riggs and Swartzel suppressed from evidence on the grounds that the detectives failed to stop questioning him after he requested an attorney. The trial court overruled appellant's motion.
 {¶ 16} At appellant's trial, the state presented the testimony of a number of witnesses, including Tina and Detective Riggs, who testified to the facts related above. Appellant's tape-recorded statement to Detectives Riggs and Swartzel was admitted into evidence, and played for the jury.
 {¶ 17} Appellant testified at trial on his own behalf. He stated that he did not sell Tina actual crack cocaine, as he had told Detectives Riggs and Swartzel, but, instead, only sold her a counterfeit substance since he was not able to get real crack cocaine as quickly as Tina wanted it. Appellant admitted that he had "punched" and "pushed" Tina after they had gotten into an argument over payment for the crack cocaine. But appellant insisted that he did not rape Tina or tie her up. He also insisted that did not steal anything from Tina's bar, stating, "There wasn't nothing there to steal." Appellant also admitted that he had had oral sex with Tina on one prior occasion, but insisted that he did not have sex with her on the night in question, as he had told Detectives Riggs and Swartzel.
 {¶ 18} As for the statements he had made to Detectives Riggs and Swartzel, which were contrary to his trial testimony, appellant explained that he had told the detectives "a story" because they had led him to believe that if he did, they would set him free. Appellant also stated that he ran from the Dayton police because he had heard that there was an outstanding warrant against him on a robbery charge and traffic violations.
 {¶ 19} The jury found appellant guilty of all six counts on which he was indicted. The trial court classified appellant as a sexual predator. The trial court sentenced appellant to serve prison terms totaling 27 years, and ordered him to pay fines totaling $57,500.
 {¶ 20} Appellant now appeals, raising the following assignments of error:
 {¶ 21} Assignment of Error No. 1:
 {¶ 22} "THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT WHEN IT OVERRULED HIS MOTION TO SUPPRESS DEFENDANT'S STATEMENT TO POLICE."
 {¶ 23} Appellant argues that his statements to Detectives Riggs and Swartzel should have been ruled inadmissible because he made certain comments to the detectives during their interrogation of him, which the detectives should have reasonably interpreted as an "unambiguous request" for counsel, and, therefore, the detectives' questioning of him should have ceased at that point. We disagree with this argument.
 {¶ 24} "[W]hen an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege[.] * * * [T]he following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him." Miranda v.Arizona (1966), 384 U.S. 436, 478-479, 86 S.Ct. 1602.
 {¶ 25} Once an accused expresses his desire to deal with the police only through counsel, the accused "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Edwards v. Arizona (1981), 451 U.S. 477, 484-485,101 S.Ct. 1880.
 {¶ 26} "Invocation of the Miranda right to counsel `requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.' McNeil v. Wisconsin, 501 U.S. at 178,111 S.Ct. at 2209. But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspectmight be invoking the right to counsel, [the United States Supreme Court's] precedents do not require the cessation of questioning. See ibid. * * *
 {¶ 27} "Rather, the suspect must unambiguously request counsel." * * * [H]e must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, Edwards does not require that the officers stop questioning the suspect." (Emphasis sic.) Davis v. UnitedStates (1994), 512 U.S. 452, 459, 114 S.Ct. 2350.
 {¶ 28} In support of his contention that he requested an attorney before making statements to the police, appellant cites the suppression hearing testimony of Detective Riggs, in which the detective stated that after he and Detective Swartzel had read appellant his Miranda rights, appellant told the detectives "that his mother told him not to talk to the police and asked for an attorney." Appellant cites the last part of this statement, i.e., "asked for an attorney," as proof of his assertion that he made a "sufficiently clear and unambiguous" request for an attorney that "mandated the cessation of all further interrogation." However, when the suppression hearing testimony of Detective Riggs is examined in its entirety, it is apparent that it does not support appellant's claims.
 {¶ 29} At the suppression hearing, Detective Riggs testified, as follows:
 {¶ 30} "I interviewed [appellant] in the presence of Detective Swartzel. We had read [appellant] his Miranda rights. At that point in time, [appellant] stated to us that his mother told him not to talk to the police and asked for an attorney. I said — asked him what he wanted to do. He said he wanted to tell us a story."
 {¶ 31} At first glance, the testimony of Detective Riggs could be interpreted to mean what appellant contends it means, i.e., that appellant told the detectives that "his mother told him not to talk to the police and [that appellant then] asked for an attorney." However, after examining this portion of Detective Riggs' testimony in context with the remainder of the detective's testimony, it is apparent that what Detective Riggs meant to say was that "[appellant] stated to [him and Detective Swartzel] that his mother told him not to talk to the police and [his mother also told him to ask] for an attorney." This interpretation of the challenged portion of Detective Riggs' testimony is amply supported by a review of appellant's cross-examination of Detective Riggs, wherein the following exchange occurred:
 {¶ 32} "Q. How many times did you read Miranda warnings to [appellant]?
 {¶ 33} "A. Twice.
 {¶ 34} "Q. When was the first time?
 {¶ 35} "A. When we started the initial interview.
 {¶ 36} "* * *
 {¶ 37} "Q. At that point in time, didn't he tell you that he didn't want to talk without a lawyer present?
 {¶ 38} "A. No, he did not.
 {¶ 39} "Q. Did he say anything along those lines?
 {¶ 40} "A. He said his mother told him to ask for an attorney.
 {¶ 41} "Q. What happened immediately after he said that?
 {¶ 42} "A. He told us that he wanted to go ahead and tell us his side of the story.
 {¶ 43} "Q. He said his mother told him to get an attorney, but he wanted to talk to you, anyway?
 {¶ 44} "A. Yes.
 {¶ 45} "Q. * * * [Y]ou didn't have any conversation between those two statements?
 {¶ 46} "A. No.
 {¶ 47} What the foregoing makes clear is that Detective Riggs, on direct examination, was not saying that appellant
had asked for an attorney, but rather, that appellant's mother
had told appellant: (1) not to talk to the police, and (2) to ask for an attorney. Appellant's statements to Detectives Riggs and Swartzel that his mother told him not to talk to police, and that his mother also told him to ask for an attorney, do not constitute an "unambiguous request for counsel" that "a reasonable police officer in the circumstances would understand * * * to be a request for an attorney." Davis, 512 U.S. at 459.
 {¶ 48} Because appellant's statements to Detectives Riggs and Swartzel did not amount to a clear, unambiguous, or unequivocal invocation of his right to counsel, the detectives were not required under Edwards to stop questioning appellant. Davis,512 U.S. at 459. See, also, State v. Jackson,107 Ohio St.3d 300, 310, 2006-Ohio-1, ¶ 95 (defendant's statements that "I talked to a lawyer or something'" or "when I talk to my lawyer" did not amount to clear, unambiguous, or unequivocal invocation of the right to counsel); State v. Brown, 100 Ohio St.3d 51,56, 2003-Ohio-5059, ¶ 19 (defendant's statement, "don't I supposed to have a lawyer present" was ambiguous, at best, and was not a clear invocation of his right to counsel); and Statev. Henness, 79 Ohio St.3d 53, 63, 1997-Ohio-405 (defendant statement "I think I need a lawyer" was not an unequivocal assertion of the right to counsel).
 {¶ 49} Appellant's first assignment of error is overruled.
 {¶ 50} Assignment of Error No. 2:
 {¶ 51} "THERE WAS INSUFFICIENT EVIDENCE TO CONVICT APPELLANT OF AGGRAVATED ROBBERY."
 {¶ 52} Appellant argues that the state presented insufficient evidence at his trial to prove the "theft offense" element of the aggravated robbery charge against him. We disagree with this argument.
 {¶ 53} "In reviewing a claim of insufficient evidence, `[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" State v. McKnight,107 Ohio St.3d 101, 112, 2005-Ohio-6046, quoting State v. Jenks, (1991),61 Ohio St.3d 259, paragraph two of the syllabus.
 {¶ 54} Appellant was convicted of aggravated robbery in violation of R.C. 2911.01(A)(3). That section states:
 {¶ 55} "(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:
 {¶ 56} "* * *
 {¶ 57} "(3) Inflict, or attempt to inflict serious physical harm on another."
 {¶ 58} R.C. 2913.01(K) defines the term "theft offense" to include a violation of any of the numerous offenses listed in that section, including a violation of R.C. 2913.02. R.C. 2913.02
defines the offense of "theft," in pertinent part, as follows:
 {¶ 59} "(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:
 {¶ 60} "(1) Without the consent of the owner * * *;
 {¶ 61} "* * *
 {¶ 62} "(4) By threat;
 {¶ 63} "(5) By intimidation."
 {¶ 64} In this case, there was evidence to show that appellant "knowingly" took Tina's cell phone, without her consent, by threat, or by intimidation, with the purpose of depriving her of that property. Thus, there was sufficient evidence presented to show that appellant committed the offense of "theft" in violation of R.C. 2913.02. It follows, then, that there was sufficient evidence presented to show that appellant committed a "theft offense" for purposes of proving that he committed aggravated robbery in violation of R.C. 2911.01(A)(3).
 {¶ 65} Appellant contends that because the evidence shows that Tina "specifically told [him] to take her cell phone before he left the premises[,]" the evidence "precludes any rational trier of fact from finding the theft element of aggravated robbery [proven] beyond a reasonable doubt." We find this contention unpersuasive.
 {¶ 66} It is apparent under the circumstances of this case that Tina did not freely consent to appellant's taking her cell phone, but, rather, merely offered it to him as a way to encourage him not to tie her up, and to leave. Tina's offering the cell phone to appellant arose from the threatening and intimidating situation that appellant himself created. As a result, the fact that Tina told appellant to "take my cell phone," when viewed in the context of all the factual circumstances of this case, would not have precluded a rational trier of fact from finding that the state had proven the "theft offense" element of the aggravated robbery charge.
 {¶ 67} Appellant also argues that even if the jury could have rationally found that he committed a theft offense by taking Tina's cell phone, the factual circumstances of this case indicates that he took the phone merely to facilitate his escape. He asserts that the offense of "[a]ggravated robbery is designed to prohibit someone from inflicting physical harm in order to facilitate a theft offense," and that the offense does not apply to someone who "commit[s] a theft to aid in fleeing the scene of an assault." We find this assertion unpersuasive.
 {¶ 68} R.C. 2911.01(A)(3) prohibits any person from, among other things, inflicting serious physical harm on another, in committing a "theft offense," as defined in R.C. 2913.01, which includes the offense of "theft" in violation of R.C. 2913.02.
 {¶ 69} Here, appellant committed several offenses against Tina, including rape, kidnapping, and theft. In committing the offense of theft against Tina, appellant inflicted "serious physical harm" on her. Consequently, these facts were sufficient to establish that appellant committed the offense of aggravated robbery in violation of R.C. 2911.01(A)(3). The fact that he committed the theft offense for purposes of facilitating his escape obviously does not provide appellant with a defense to this charge.
 {¶ 70} Appellant's second assignment of error is overruled.
 {¶ 71} Assignment of Error No. 3:
 {¶ 72} "THE TRIAL COURT'S CONVICTIONS OF APPELLANT AS TO COUNTS ONE, TWO, THREE, AND FOUR WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 73} Appellant argues that his convictions for aggravated robbery pursuant to R.C. 2911.01(A)(3), two counts of rape pursuant to R.C. 2907.02(A)(2), and one count of kidnapping pursuant to R.C. 2905.01(A)(4) were against the manifest weight of the evidence.[1] We disagree with this argument.
 {¶ 74} "Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. [Citation omitted.] Weight of the evidence concerns `the inclination of the greater amount ofcredible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducingbelief.' (Emphasis added.) [Citation omitted.]" State v.Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52.
 {¶ 75} In ruling upon a manifest weight of the evidence claim, an appellate court reviews the entire record, weighs the evidence and all reasonable inferences that can be drawn from it, and considers the credibility of witnesses, to determine "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Thompkins, 78 Ohio St.3d at 387, quoting State v. Martin (1983), 20 Ohio App.3d 172, 175.
 {¶ 76} Although a reviewing court is permitted to consider the credibility of the witnesses in ruling upon a manifest-weight-of-the-evidence argument, the court's "review must nevertheless be tempered by the principle that weight and credibility questions are primarily for the trier of fact."State v. Kash, Butler App. No. CA2002-10-247, 2004-Ohio-415, ¶25, citing State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. The trier of fact is entitled to believe all, part, or none of the testimony of any witness. State v.Nichols (1993), 85 Ohio App.3d 65, 76, citing State v.Harriston (1989), 63 Ohio App.3d 58, 63; and State v. Caldwell
(1992), 79 Ohio App.3d 667, 679. The trier of fact's decision on these matters "is owed deference since the trier of fact is `best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.'" Kash, citing SeasonsCoal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 80; see, also,Nichols, citing Seasons Coal Co.
 {¶ 77} Appellant first argues that his convictions on the rape, aggravated robbery, and kidnapping charges in the first four counts of the indictment were against the manifest weight of the evidence because Tina gave Detectives Riggs and Swartzel conflicting information regarding the identity of her assailant, by first telling the detectives that two masked men had attacked her and that she did not know their identity, and then telling them it was appellant who had attacked her. We find this argument unpersuasive.
 {¶ 78} Tina explained at trial that she did not initially identify appellant as her assailant because he had told her that he would kill her if she did so. The jury was entitled to find this explanation to be a plausible one, and, therefore, it was entitled to accord little or no weight to the change in Tina's statements. See Nichols, 85 Ohio App.3d at 76.
 {¶ 79} Appellant also notes that Tina admitted she had used cocaine a "couple times a month" for a "[c]ouple years," and that she had concealed this fact from her boyfriend. However, this fact also fails to convince us that the jury "lost its way" in resolving the evidentiary conflicts in this case. SeeThompkins, 78 Ohio St.3d at 387, quoting Martin,20 Ohio App.3d at 175.
 {¶ 80} As to appellant's convictions on the rape charges in violation of R.C. 2907.02(A)(2), appellant points to the lack of physical evidence corroborating Tina's testimony. However, the lack of such evidence is not fatal to appellant's conviction on those charges.
 {¶ 81} R.C. 2907.02(A)(2) states, in pertinent part, that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."
 {¶ 82} There is nothing in the law that requires a rape victim's testimony to be corroborated as a condition precedent to conviction. Nichols, 85 Ohio App.3d at 76, citing State v.Lewis (1990), 70 Ohio App.3d 624, 638; State v. Sklenar
(1991), 71 Ohio App.3d 444, 447; and State v. Banks (1991),71 Ohio App.3d 214, 220.
 {¶ 83} As to appellant's conviction on the aggravated robbery charge, appellant, again, points out that Tina told him to take her cell phone, and, therefore, appellant argues that the jury's finding that he was guilty of the aggravated robbery charge was against the manifest weight of the evidence. We disagree with this argument.
 {¶ 84} As we have previously noted, the evidence plainly shows that Tina offered appellant her cell phone to persuade him not to tie her up again, which he did anyway, and as an inducement to get him to leave. She did not voluntarily give him her cell phone. The jury's decision finding that appellant had committed each of the elements of aggravated robbery was not contrary to either the sufficiency or manifest weight of the evidence.
 {¶ 85} Appellant also argues that his conviction for kidnapping in violation of R.C. 2905.01(A)(4) was against the manifest weight of the evidence. We disagree with this argument.
 {¶ 86} R.C. 2905.01 states, in pertinent part:
 {¶ 87} "(A) No person, by force, threat, or deception * * * shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:
 {¶ 88} "* * *
 {¶ 89} "(4) To engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will[.]"
 {¶ 90} Appellant asserts that while there was "physical evidence of a physical altercation in [Tina]'s bar in the form of photographs and blood samples, there is no physical evidence connecting [him] to the scene." He contends that the fact there was a physical altercation between him and Tina is consistent with his testimony that the two had fought over Tina's failure to pay him for the cocaine she had requested. He further argues that Tina's statement that appellant did not have permission to have sex with her was contradicted by his testimony, and that his credibility was greater than Tina's. We find this argument unpersuasive.
 {¶ 91} Initially, appellant's own testimony connected him to the scene of the crimes alleged in the indictment. Furthermore, it was primarily for the jury to determine whether Tina's version of events was more credible than appellant's. Nichols,85 Ohio App.3d at 76. A review of Tina's and appellant's trial testimony leaves no doubt as to why the jury chose to believe Tina and disbelieve appellant. Among other things, appellant attempted to retract the statements he made to Detectives Riggs and Swartzel on the grounds that he had simply told them a "story" since he was under the impression that if he did so, he would be freed. But in one part of that "story," he had stated that he thought Tina was dead when he left her. Appellant could not possibly have believed that he was going to be set free if he told the detectives that "story."
 {¶ 92} The state presented ample evidence to convict appellant on all counts in the indictment, and the jury did not lose its way in convicting appellant on those charges.
 {¶ 93} Appellant's third assignment of error is overruled.
 {¶ 94} The trial court's judgment is affirmed.
Powell, P.J., and Young, J., concur.
[1] Appellant does not raise a manifest-weight-of-the-evidence challenge to his convictions on the other kidnapping count against him ("Count Five"), which charged a violation pursuant to R.C. 2905.01(A)(2), or on the felonious assault charge ("Count Six").